NELSON INCORPORATED OF WISCONSIN, Appellant, v. SEWERAGE COMMISSION OF CITY OF MILWAUKEE, Respondent.

*No. 784 (1974). Argued April 7, 1976.—Decided May 4, 1976.*
(Also reported in 241 N. W. 2d 390.)

For the appellant there was a brief by *Foley & Capwell,* S. C. of Racine, and oral argument by *Rex Capwell.*

For the respondent there was a brief by *James B. Brennan,* city attorney, and *Patrick B. McDonnell,* assistant city attorney, and oral argument by *Patrick B. McDonnell.*

BEILFUSS, J. In early January of 1971, the defendant Sewerage Commission of the city of Milwaukee advertised for bids on a project known as *Contract 853—Aeration Basins for Secondary Treatment Facilities—South Shore Waste Water Treatment Plant.* The project was divided into five branches, A through E, for bidding purposes. Sealed bids for each of the branches were required to be submitted to the commission not later than 1:30 p.m., on January 26, 1971, at which time all bids were to be publicly opened.

The advertisement for bids came to the attention of Elmer F. Nelson, president of Nelson Incorporated, about two or three weeks prior to the close of bidding. Nelson obtained copies of the plans and specifications for the project from the commission on January 13, 1971. Just prior to the deadline time for submitting bids, Nelson Incorporated submitted a lump-sum bid on branch A of the project in the amount of $5,677,000. Included with the bid was a certified check payable to the commission in the amount of $50,000. This deposit was required by the notice to bidders "as a guarantee that if the bid is accepted, the bidder will execute and file the proposed contract and bond within 10 days after the notice of award of contract."

The bids were opened as scheduled and Nelson Incorporated was revealed to be the low bidder on branch A of the project. The second lowest bid was $6,198,000 and the highest was $10,775,000. Elmer Nelson was

informed of these results on the day the bids were opened and became concerned with the size of the difference between plaintiff's bid and that of the next lowest bidder. He immediately began to check plaintiff's bid for mistakes and discovered that the cost of installing the influent conduit had been omitted from the bid. The amount of this omission was $114,000. Nelson discussed the effect the error would have on plaintiff's ability to perform the contract with other company officials. It was decided to check the bid further for other errors.

The next day, January 27, Nelson discovered three more cost omissions. They were: Dewatering process—$41,700; concrete support structures—$10,000; and winter protection for diffuser plates—$19,000. Despite the discovery of these errors, company officials decided to go ahead with the bid as submitted. Nelson continued to check the bid on January 28th but found no further errors. On the afternoon of that day, Nelson left for a construction industry conference in Denver and was gone for five days. During his absence other members of the firm continued to check the bid for errors but found none.

Upon his return from Denver, Nelson resumed his check of the bid. On Saturday, February 7th, Nelson discovered that an error had been made in entering the cost for unloading and installing 6,528 diffuser plate containers. It had been determined that it would take one-half hour to unload each container and an additional three hours to install it. The actual cost was $7.50 per hour. The cost on the bid summary sheet, however, was erroneously entered as $3 for installation and $.50 for unloading. This mistake resulted in an error of $193,515. The total of the errors and the omissions was $378,215.[1]

Upon discovering the last error, Nelson and other officials determined the company could not perform a

---

[1] The records and briefs contain some arithmetical inconsistencies as to the dollar amounts of the valuations.

contract for the amount of the bid. Their counsel was contacted on Monday, February 9th. On his suggestion, a letter dated February 10th was sent to Alvord, Burdick & Howson, consulting engineers on the project, informing them that the omissions had occurred and requesting a meeting with the engineers and the commission. A meeting was held on February 22, 1971, between representatives of Nelson Incorporated, Alvord, Burdick & Howson, and the commission. At that meeting Nelson called the commission's attention to the five errors and omissions.

Subsequently, on March 23, 1971, Nelson appeared with counsel on plaintiff's behalf at a meeting of the commission. Permission was sought to amend the plaintiff's bid to correct the errors. The commission refused to allow the amendment and instead voted to accept the plaintiff's bid as originally submitted. By letter dated April 2, 1971, the commission formally notified the plaintiff that it had been awarded the contract on branch A. Plaintiff was asked to execute the contract and return it with the required surety bond. By letter dated April 26, 1971, Nelson Incorporated refused to execute the contract.

Upon appeal the plaintiff contends that the trial court erred in concluding the plaintiff had not complied with sec. 66.29 (5), Stats.

The contract involved in this case was let by competitive bid pursuant to the requirements of sec. 12.24 (8) of the Milwaukee City Charter. That section provides that the commission "may permit a sum of money or a certified check payable to the order of the commission to be filed with any bid or proposal in such an amount as in the judgment of the commissioners will save the city from any loss if the bidder shall fail to execute a contract pursuant to law, in case his bid is accepted and the contract awarded to him." Pursuant to this provision,

bidders on branch A of the project were required to deposit $50,000.

The contract on branch A was awarded by the commission to the plaintiff. The plaintiff, however, refused to execute the contract and demanded the return of its deposit. The commission declined to return the check and the plaintiff commenced this action, alleging full compliance with the provisions of sec. 66.29 (5), Stats. The first portion of the section deals with errors or omissions discovered before the bids are opened and has no application to the facts of this case. The second portion of the statute is as follows:

"CORRECTIONS OF ERRORS IN BIDS. . . . In case any such person shall make an error or omission or mistake and shall discover the same after the bids are opened, he shall immediately and without delay give written notice and make known the fact of such mistake, omission or error which has been committed and submit to the municipality, board, public body or officers thereof, clear and satisfactory evidence of such mistake, omission or error and that the same was not caused by any careless act or omission on his part in the exercise of ordinary care in examining the plans, specifications, and conforming with the provisions of this section, and in case of forfeiture, shall not be entitled to recover the moneys or certified check forfeited as liquidated damages unless he shall prove before a court of competent jurisdiction in an action brought for the recovery of the amount forfeited, that in making the mistake, error or omission he was free from carelessness, negligence or inexcusable neglect."

The trial court found that the plaintiff had not given timely notice to the commission of the errors and omissions in its bid and that those errors and omissions were the result of plaintiff's carelessness, negligence and inexcusable neglect. The plaintiff contends that these findings are contrary to the facts and the law.

Section 66.29 (5), Stats., requires that when an error, omission or mistake is discovered after bids are opened,

the bidder "shall immediately and without delay give written notice and make known the fact of such mistake, omission or error which has been committed." The record reveals that the bids were opened on January 26, 1971. The first omission was discovered the same day and three other omissions were discovered the following day. Elmer Nelson testified that officials of the company decided to go through with the bid despite the discovery of these errors. Although Nelson and other officials continued to check the bid summary, the last error was not discovered until February 7th. It was at this time that officials determined that the contract could not be performed as bid. Counsel was contacted on February 9th. By letter dated February 10th, the plaintiff informed Alvord, Burdick & Howson, consulting engineers on the project, that the omissions had occurred and requested a meeting with the commission "so that we can furnish you with clear and satisfactory evidence of the specific errors and omissions we have discovered in our bid."

Upon this record the trial court held that the requirement that notice be given "immediately and without delay" had not been met. In its written opinion the court stated:

". . . the statute clearly places a duty upon the bidder who has made mistakes, omissions or errors in his bid to so advise the Commission in writing immediately and without delay and make known the fact of such mistake, omission or error to the Commission. The statute does not authorize such bidder to wait until he determines whether his bid will be a burden upon him. The duty of the plaintiff to advise the Commission in writing immediately and without delay of the omissions which it discovered on January 26 and January 27 applied upon the discovery of these errors and not upon the discovery of the fifth error."

The plaintiff contends that the trial court erred in its construction of the statute. It argues that no duty to inform of mistakes or omission in a bid can arise under

the statute until the bidder determines that he will be prejudiced by that mistake or omission in the performance of the contract if the bid is accepted. The plaintiff points out that the decision that the contract could not be performed as bid was not made until the fifth error was discovered on February 7th. It contends that the notice given by the letter of February 10th was sufficient under the statute.

Public policy considerations operate to restrict the rights of a bidder on a public contract. Competitive bidding requirements were intended for the benefit and protection of the public. They are designed to prevent fraud, collusion, favoritism and improvidence in the administration of public business as well as to insure that the public receives the best work or supplies at the most reasonable price practicable.[2] It follows from these considerations that a bid on a public contract is to be considered final and binding on the bidder. To protect the public interest, the municipal bidding authority is entitled to require that a bidder deposit a sum of money to guarantee the making of the contract on the terms bid.[3] One author has described the consequences of submitting a bid on a public contract as follows:

"A bid submitted to a local government is deemed in law to be in the nature of an option for which consideration was given, creating a vested right of contract, of which the local government cannot be deprived except by its consent, and is remedial at law, by an action at damages, or enforcement in equity by specific performance, if feasible, or may be summarily dealt with by forfeiture of the deposit. 'In the absence of equities justifying rescission or other equitable relief,' says a

[2] See: Aqua-Tech v. Como Lake Protect. & Rehab. Dist. (1976), 71 Wis. 2d 541, 239 N. W. 2d 25; Blum v. Hillsboro (1971), 49 Wis. 2d 667, 183 N. W. 2d 47.

[3] See: 63 C. J. S., Municipal Corporations, pp. 827, 828, sec. 1152; Palo & Dodini v. City of Oakland (1947), 79 Cal. App. 2d 739, 180 Pac. 2d 764.

New Jersey court, 'a successful bidder cannot arbitrarily withdraw his bid at any time before acceptance. Such a bid is held to be in the nature of an option giving the municipality a vested right of contract.' " 1A Antieau (1974), *Municipal Corporation Law*, p. 776, sec. 10.42, citing *Carlin v. City of Newark* (1955), 36 N. J. Super. 74, 114 Atl. 2d 761, 767.

Consistent with this position, the rule developed that a bidder could not maintain an action at law to recover a deposit forfeited by his failure to make a contract upon the terms of his bid.[4] However, courts have granted relief in equity to a bidder who, having discovered a material mistake of fact in his bid which is not due to his own failure to exercise ordinary care, acts promptly in informing the public authorities and requests the withdrawal or correction of his bid before the award is made.[5] In such cases courts have required the public body to return the deposit held as security for the bidder's performance. The availability of such relief at common law was recognized by this court in *Gavahan v. Shorewood* (1930), 200 Wis. 429, 228 N. W. 497, where the mistake was discovered before the bids were opened.

Section 66.29 (5), Stats., was enacted by ch. 395, Laws of 1933. It appears that in enacting that section the legislature intended to adopt the equitable rule of relief with limitations. As such, the statute should be construed consistent with that purpose. A requirement that the bidder immediately report all mistakes in his bid is not necessarily consistent with the purpose of the statute in all instances. The obligation to report errors and omissions "immediately and without delay" arises upon the discovery of a mistake which, in the judgment of the

---

[4] *See:* 64 Am. Jur. 2d, *Public Works and Contracts*, pp. 942, 943, sec. 83.

[5] *See:* Annot., *Rights and remedies of bidder for public contract who has not entered into a contract, where bid was based on his own mistake of fact or that of his employees*, 52 A. L. R. 2d 792.

bidder, would preclude the performance of the contract as bid.

The trial court expressly found that the plaintiff intended to go through with the contract as bid despite the discovery of the first four errors on January 26 and 27. It was only after discovering the fifth error that the determination was made to seek relief from the bid by way of amendment or withdrawal. It was at this point that the obligation to immediately report the mistakes arose. Three days elapsed, including a weekend, between the discovery of the fifth mistake and the sending of the letter which informed the consulting engineers on the project of the errors and requested a meeting with the commission. Under these circumstances we believe the notice was given " 'within such convenient time as is reasonably requisite for doing the thing' " so as to satisfy the requirement that it be given "immediately and without delay." *See: Krasin v. Almond* (1940), 233 Wis. 513, 517, 290 N. W. 152.

Section 66.29 (5), Stats., requires that the bidder "immediately and without delay give written notice and make known the fact of such mistake, omission or error which has been committed." The plaintiff's letter of February 10th provided, in pertinent part:

"You request a breakdown of the lump sum bid made by Nelson Incorporated of Wisconsin. You indicated that you desire that we elaborate on this item before entering into the contract. As you know, we have been reviewing our initial bid submitted January 26, 1971, and we believe there are omissions and errors therein, which we hereby call to your attention pursuant to Section 66.29 (5) Wis. Stats.

". . . We respectfully request a meeting between our representatives, representatives of the owner, and yourselves. . . , so that we can furnish you with clear and satisfactory evidence of the specific errors and omissions we have discovered in our bid."

We conclude that the contents of the letter satisfy the requirements of sec. 66.29 (5), Stats. It makes known the fact of the mistakes. The statute does not expressly require that the written notice itself contain the "clear and satisfactory evidence" of the nature of the errors or that they were not caused by the bidder's careless act or omission.

While sec. 66.29 (5), Stats., is intended primarily for the benefit of the bidder, the requirement of prompt notice is included to provide some degree of protection to the bidding authority. It is intended to minimize the prejudice to the public body which might result from reliance on a bid which, because of mistake, is sought to be withdrawn or amended. To give full effect to the notice requirement it is necessary that the bidder exercise reasonable diligence, not only in giving notice once a material mistake is discovered, but also in undertaking to check for such mistakes.

The record in this case reveals that Elmer Nelson was personally responsible for compiling the bid and did all the actual work in examining the plans and specifications and in preparing the bid summary which served as the basis for the lump-sum bid. When the bids were opened Nelson became concerned with the difference between his bid and the next lowest bid and immediately began to examine his bid for mistakes. After the first four mistakes were discovered on January 26 and 27, a determination was made to continue with the contract as bid. However, Nelson was still concerned with the remaining difference between the bids and continued to check his bid on January 28 but found no errors. On the afternoon of that day Nelson left for a five-day construction industry conference in Denver which he had made previous arrangements to attend. In his absence other members of the firm continued to check the bid for errors but found none. When Nelson returned from the conference

he resumed his personal check of the bid and discovered the fifth error.

The trial court was apparently of the opinion that Nelson was not justified in going to Denver when it appeared that there were still errors in the bid which he had prepared and with which he was most familiar. The court concluded that had Nelson foregone the trip and continued to check the bid, he would have discovered the fifth mistake earlier and, consequently, notice of the errors would have been given at an earlier date.

Nelson testified that he had made a prior commitment to attend the conference. It lasted only five days. In his absence other members of the firm were assigned to continue to check the bid. Upon his return Nelson immediately resumed his personal inspection of the bid summary. There was no indication in the record that the commission desired to make an immediate determination as to which bidder should be awarded the contract. By letter dated January 28, 1971, the consulting engineers on the project had informed certain of the low bidders that an evaluation of the bids was dependent upon certain additional infomation to be furnished by the bidders. The letter concluded: "We look forward to hearing from you on the above matters at your earliest convenience." We do not believe there is sufficient evidence to support a conclusion that the commission was prejudiced by the delay caused by Nelson's attendance at the conference. The bid proposal provided for acceptance within 60 days after the bids were opened. As the plaintiff correctly points out—from the date of the notice some 40 days remained within which the commission could act on the bids.

On these facts we conclude the plaintiff exercised the diligence required by the statute both in searching its bid for errors and in giving notice of those errors when it determined that the contract could not be performed as bid.

However, under sec. 66.29 (5), Stats., the plaintiff is not entitled to recover the deposit unless the mistakes in its bid were shown not to have been due to its "carelessness, negligence or inexcusable neglect."

Section 66.29 (5), Stats., provides that when a bidder fails to enter into a contract as bid, he is not entitled to recover money held as security for that performance "unless he shall prove before a court of competent jurisdiction in an action brought for the recovery of the amount forfeited, that in making the mistake, error or omission he was free from carelessness, negligence or inexcusable neglect." The trial court found that the five errors or omissions in the plaintiff's bid were the result of carelessness and negligence and that the plaintiff had not proved by clear and satisfactory evidence that those errors were not caused by the failure to exercise ordinary care in examining the bid before it was submitted.

The plaintiff contends that the trial court's finding was error and takes the position that only the circumstances surrounding the fifth error may be considered in making the determination contemplated by the statute. It is true, as noted above, that the determination not to proceed on the contract as bid was not made until the fifth error was discovered. This factor was important in determining when the duty to notify the commission arose. However, it does not follow that, in determining whether the plaintiff was careless or negligent in the preparation of its bid, only the circumstances surrounding the fifth error may be considered. It is apparent that the plaintiff's decision to seek relief from the bid was based on the combined effect of all five errors. It should not now be heard to argue that carelessness with respect to one of the earlier errors should be disregarded simply because, considered alone, that error would not have led to a decision to abandon the bid.

Relying on *Krasin v. Almond, supra,* the plaintiff argues that any neglect in the preparation of the bid was

excusable. In *Krasin,* a defective adding machine recorded an "0" instead of a "6" when the cost of the bid was tallied. The result was a $6,000 error in the bid as submitted. The error was discovered on the day the bids were opened and notice was immediately given. The trial court allowed recovery of the $2,000 deposit which was forfeited when the plaintiff refused to perform the contract for the amount stated in his bid. The defendant village argued on appeal that the mistake in the bid was due to the plaintiff's carelessness, negligence or inexcusable neglect. This court stated at page 519:

"The three terms last above appearing as applied to the instant facts are synonymous. 'Carelessness' consists of the doing of some act or omitting to do some act. So as to negligence. The 'carelessness' or 'negligence' here involved, if any there was, consists of an omission to do some act. The 'neglect' involved, if any there was, consists of that same omission. The 'carelessness' or 'negligence,' if any, was thus only 'neglect.' The only neglect that under the statute visits the penalty of forfeiture is 'inexcusable neglect.' . . . The trial court manifestly considered such neglect of the plaintiff as was involved, if any, as excusable, and the facts as stated preceding the opinion support that conclusion, . . ."

In *Krasin* the court construed the statute to hold the terms "carelessness, negligence or inexcusable neglect" are synonymous. The clear meaning of the statute is that the bidder should not be relieved of the consequences of his mistake where that mistake is due to his failure to exercise ordinary care in the preparation of the bid. As it is used in the statute, "neglect" should include omission or oversight. An omission or oversight which results in a forfeiture is inexcusable where it is due to the bidder's failure to exercise ordinary care. The statute cannot reasonably be read to require, as the plaintiff seems to contend, that any negligence must also be found to be "inexcusable." By definition, negligence or

carelessness is conduct which is inexcusable under the circumstances.

The question here, then, is whether the evidence supports the trial court's conclusion that the errors in the plaintiff's bid were due to its failure to exercise ordinary care. Elmer Nelson, the plaintiff's president, assumed the responsibility of preparing the bid. He obtained the plans and specifications for the bid on January 13, 1971. Although the amount of the actual bid was not determined until just prior to the bid deadline on January 26th, Nelson stated he had enough time to work on his company's portion of the bid. The total bid was $5,677,-000. Of this amount Nelson Incorporated was to perform approximately $1,892,000 of the work with its own work force. The major part was to be performed by subcontractors. All of the errors discovered in the bid involved work to be performed by the plaintiff and none were attributable to the portions of the bid prepared by the subcontractors. The total amount of the errors ($378,215) represented 17 percent of the plaintiff's share of the bid.

The first error was discovered on the day the bids were opened and involved an omission of $114,000 representing the cost of installing the influent conduit. Nelson testified that a large portion of the time spent in preparing the bid involved an alternative method of constructing the wye wall for the influent conduit. The alternative method was less costly than the one described in the specifications and several discussions were held with the consulting engineers in an effort to seek approval of the substitute method. Nelson stated that although considerable time was spent on that aspect of the bid, he neglected to determine its cost and include it in the final lump-sum bid.

Three more errors were discovered on January 27th. The cost of a dewatering mechanism, involving $41,700,

was omitted. Nelson stated that a line had inadvertently been drawn through the space on the bid summary where that item was to be entered. The cost of concrete support, in the amount of $10,000, was also omitted. Nelson stated he had erroneously assumed the mechanical contractors were to include that item in their portion of the bid. The fourth error involved the omission of the cost of winter protection for the diffuser plates in the amount of $19,000. Nelson, in referring to the first four errors, stated "[t]hey were errors of omission I think because of the speed and excitement and so forth of putting a bid together that can happen, things could very easily be omitted." Nelson characterized the errors as "neglectful omissions."

The fifth error, discovered after Nelson's return from Denver, involved the failure to properly calculate the cost of unloading and installing the diffuser plates. This mistake resulted in a $193,515 error in the bid and was described by Nelson as a "mental mistake."

Nelson stated that he checked the bid summary before the bid was submitted but did not notice the errors. All bids were in lump-sum form. Dale T. Lundy, an Alvord, Burdick & Howson associate, stated that the consulting engineers had estimated the cost of the project at $5,700,000. The plaintiff's bid as originally submitted was within .3 of one percent of that estimate. Lundy stated that, in his opinion, it was negligence for Nelson to fail to include the cost of the wye wall in view of the amount of time spent on that portion of the bid. Werner Peot, director of engineers for the commission, was involved in arranging for and taking bids and working up the contract for the project. He stated that it was not unusual for bids to contain errors of the type contained in plaintiff's bid. However, he stated that the errors in plaintiff's bid were greater than those normally seen in a bid on a public contract.

This evidence supports the trial court's finding and conclusion that the errors were due to the plaintiff's failure to exercise ordinary care in the preparation of the bid. They are distinguishable from the mistake involved in the *Krasin Case*. As noted above, sec. 66.29 (5), Stats., appears as a codification of the equitable rule. An essential condition of equitable relief is the bidder's freedom from negligence in the preparation of its bid. The trial court's finding in this respect is not against the great weight and clear preponderance of the evidence and must be sustained.

The plaintiff also argues that it breached no obligation by refusing to execute the contract and that the commission therefore should not be permitted to retain the deposit. The plaintiff concedes that the deposit was required to guarantee its execution of the contract following an award by the commission. However, it contends that no contract was formed when the commission accepted its original bid. The plaintiff argues that because its bid contained material mistakes there could be no "meeting of the minds" on the essential terms of the contract.

We believe the plaintiff misstates the legal consequences of submitting a bid on a public contract. As noted above, such a bid is considered to create a vested right of contract in the local governmental body. The bidder has no "right" to withdraw its bid or to demand that it be amended. This result is necessary to effectuate the purpose of competitive bidding requirements. Holding that bidders are not bound by their bids would open the door to fraud and collusion and undermine the common standard of competition by placing individual bidders in a position of advantage over other bidders.[6] If

---

[6] *See: Modany v. State Public School Building Authority* (1965), 417 Pa. 39, 208 Atl. 2d 276; *Township of River Vale v. R. J. Longo Const. Co., Inc.* (1974), 127 N. J. Super. 207, 316 Atl. 2d 737.

competitive bidding requirements are to retain their efficacy, the binding effect of a bid must be recognized and affirmed.

Section 66.29(5), Stats., is labeled "Corrections of Errors in Bids," thereby indicating a legislative intent that bids might be amended under certain circumstances. It is clear from the statute, however, that an amendment is not a matter of right. A bidder has no absolute right to withdraw or amend a bid for a public contract and the governmental body could not be compelled to allow an amendment.[7] Where the governmental body has refused to allow an amendment and has chosen instead to award the contract upon the bid as submitted, the bidder's sole remedy is to proceed under sec. 66.29 (5). Where the requirements of that statute are not met, the bidder cannot recover.

The plaintiff finally argues the commission did not timely accept its bid.

The bid proposal drafted by the commission and executed by the plaintiff provided in part:

"All prices stated herein are firm and shall not be subject to escalation provided this proposal is accepted within 60 days after the date of official opening.

". . .

"The undersigned hereby agrees to enter into contract on the attached contract form within 10 days from date of notice from the Secretary that the contract has been accepted.

"If this Proposal is accepted and should the undersigned for any reason fail to sign the contract as above stipulated, the certified check. . . which has been deposited with the Sewerage Commission of the City of Milwaukee as a proposal guarantee shall, at the option of the Sewerage Commission of the City of Milwaukee, be forfeited. . . ."

---

[7] *See: Menzl v. Milwaukee* (1966), 32 Wis. 2d 266, 145 N. W. 2d 198; *Aqua-Tech v. Como Lake Protect. & Rehab. Dist., supra; State ex rel. Hron Brothers Co. v. Port Washington* (1953), 265 Wis. 507, 510, 62 N. W. 2d 1.

The bids were opened on January 26, 1971. The letter notifying plaintiff that it had been awarded the contract was dated April 2, 1971. The plaintiff points out that this represents a lapse of 66 days. It contends that the acceptance was late and that it was therefore not obligated to execute the contract.

As a general rule, where an offer prescribes the time and manner of acceptance, its terms must be complied with in order to create a contract.[8] It is the plaintiff's position that no acceptance of its bid could occur where the "notice from the Secretary that the contract has been accepted" was not sent within 60 days of the opening of the bids. In our opinion this position is not supported by a reasonable reading of the bid proposal. That proposal requires only that there be acceptance within 60 days. There is no requirement that the formal notice of award be sent within that time.

The record reveals that the plaintiff's president, Elmer Nelson, appeared before a meeting of the Sewerage Commission on March 23, 1971. At that meeting the commission formally voted to accept the plaintiff's bid as submitted. Nelson testified that he was present when the resolution was passed accepting the bid and that he "understood that the bid was accepted at that time." Upon this record there can be no doubt that the acceptance was communicated to the plaintiff within the 60-day period. Under these circumstances a contract was formed even though the formal written notice of award had not been sent or the contract executed.[9] Under the terms of the proposal the commission was entitled to retain the deposit

[8] *See:* Restatement, 1 *Contracts*, p. 67, sec. 61; *Conrad Milwaukee Corp. v. Wasilewski* (1966), 30 Wis. 2d 481, 141 N. W. 2d 240.

[9] *See: L. G. Arnold, Inc. v. Hudson* (1934), 215 Wis. 5, 9, 254 N. W. 108; 64 Am. Jur. 2d, *Public Works and Contracts*, p. 917, sec. 63.

upon the plaintiff's failure to execute the contract within 10 days of the notice of award.

*By the Court.*—Judgment affirmed.