AMERICAN NATIONAL PROPERTY AND CASUALTY
COMPANY, Plaintiff-Respondent,†

v.

Marderos NERSESIAN and Susan Nersesian,
Defendants-Third-Party Plaintiffs-Appellants,

WEST BEND MUTUAL INSURANCE COMPANY, Defendant,

v.

Jacinto R. BENAVIDEZ, United Services Automobile
Association General Indemnity Company, and
Racine Unified School District, Third-Party
Defendants. [Case No. 03-3343.]

AMERICAN NATIONAL PROPERTY AND CASUALTY
COMPANY, Plaintiff-Respondent,†

v.

Marderos NERSESIAN and Susan Nersesian,
Defendants-Third-Party Plaintiffs,

WEST BEND MUTUAL INSURANCE COMPANY, Defendant,

v.

Jacinto R. BENAVIDEZ, Third-Party Defendant-
Respondent,

UNITED SERVICES AUTOMOBILE ASSOCIATION GENERAL
INDEMNITY COMPANY, Third-Party Defendant,

---

† Petition to review denied 3-8-2005.

RACINE UNIFIED SCHOOL DISTRICT, Third-Party
Defendant-Appellant. [Case No. 03-3435.]

Court of Appeals

*Nos. 03–3343, 03–3435. Submitted on briefs September 9, 2004.
—Decided October 20, 2004.*

2004 WI App 215

(Also reported in 689 N.W.2d 922.)

[redacted]

On behalf of the third-party defendant-appellant, the cause was submitted on the briefs of *David A. Westrup* and *Maureen Hegarty Kanter* of *von Briesen & Roper, S.C.*, Milwaukee.

On behalf of the defendants-third-party plaintiffs-appellants, the cause was submitted on the briefs of *D. Michael Guerin* and *Kathryn A. Keppel* of *Gimbel, Reilly, Guerin & Brown*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Patrick J. Anderson* of *Mohr & Anderson, LLC*, Hartford.

Before Anderson, P.J., Brown and Snyder, JJ.

¶ 1. ANDERSON, P.J. Marderos and Susan Nersesian appeal from a circuit court order granting American National Property and Casualty Company's (ANPAC's) motion for summary judgment. The Nersesians contend that the circuit court erred in concluding that they had entered into a valid and enforceable settlement agreement with ANPAC. After an examination of the record in this matter and, in particular, the correspondence between the parties, we conclude that the Nersesians never accepted ANPAC's offer and therefore a settlement agreement was never reached. Accordingly, we reverse.

434

## FACTS

¶ 2. On December 17, 1999, Marderos was involved in an automobile accident with ANPAC's insured, Jacinto R. Benavidez, in Racine county. As a result of the accident, the Nersesians retained the law firm Gimbel, Reilly, Guerin & Brown to represent both of their interests relative to the injuries and damages Marderos sustained in the accident. On January 15, 2000, Sue M. Soczka, a paralegal at the law firm who was assisting Attorney D. Michael Guerin with the case, wrote to ANPAC advising it that the firm had been retained by the Nersesians. Thereafter, ANPAC wrote to Soczka confirming ANPAC's understanding that the law firm had been retained to represent the Nersesians and requesting all of Marderos's medical information. Over the course of the months following the Nersesians' retention of the law firm, various representatives of ANPAC and the firm exchanged information regarding the potential settlement of the Nersesians' claims.

¶ 3. On June 19, 2001, Guerin submitted a letter to ANPAC proposing to settle the case for $48,500. On July 2, 2001, ANPAC informed the Nersesians that it would be willing to settle their claims for $15,000. On August 9, 2001, Guerin rejected the $15,000 settlement offer and proposed to settle the Nersesians' claims for $36,750. On August 24, 2001, ANPAC increased its offer to $16,500.

¶ 4. Ultimately, on December 20, 2001, Soczka sent a letter by facsimile to ANPAC confirming that the parties had agreed to resolve the Nersesians' claims for a total of $17,725. Soczka wrote:

> This will confirm that the above-entitled claim has been settled for a total of $17,725. As was discussed with Attorney D. Michael Guerin, we would greatly

appreciate it if two settlement checks were issued to our firm's trust account, to reflect the separate claims of Susan Nersesian for her loss of consortium with that of the personal injury claim of Marderos Nersesian. To that end, if one check could be issued in the amount of $2,500 (for Mrs. Nersesian's claim) and the other in the amount of $15,225 (for Mr. Nersesian's claim) . . . .

As you are aware, Mr. Nersesian was acting within the scope of his employment at the time this accident occurred; therefore, his settlement proceeds must be distributed in accordance with Wisconsin State Statute Section 102.29. Enclosed for your file is a copy of the worker's compensation distribution based on the $15,225 settlement.

If you should have any questions or concerns regarding the above, please do not hesitate to contact me. Otherwise, we look forward to receiving the settlement checks and release from you in the near future.

Soczka also enclosed a copy of a worker's compensation distribution agreement based on the $15,225 settlement.

¶ 5. On January 4, 2002, Soczka wrote ANPAC advising it that the worker's compensation carrier, West Bend Mutual Insurance Company, had agreed to the settlement. She further wrote: "Our office will provide you with a conformed copy of the [worker's compensation] document when we return the executed release. We look forward to receiving the settlement paperwork from you in the near future." On that same date, ANPAC also wrote to Soczka confirming that the case had been settled for a total payment of $17,725. The letter stated:

This will confirm settlement of this case for a total payment of $17,725, including any and all liens known or unknown.

Per your request, we have cut two settlement checks. Also enclosed is a Release. I ask that you return the signed, notarized Release before negotiating the check.

I do appreciate your help and cooperation in working to resolve this case.

Soczka forwarded the release and settlement checks to the Nersesians.

¶ 6. On January 30, Soczka received a telephone call from Marderos, who informed her that he was experiencing numbness and tingling in his right side (along with an associated loss of coordination), which radiated from his neck through his arms. Marderos reported that he began to experience these symptoms in late December 2001. He advised Soczka that he had seen his physician about the symptoms and had been referred to another doctor for an orthopedic assessment.

¶ 7. Based upon her conversation with Marderos, Soczka contacted ANPAC and West Bend in early February to advise them as to Marderos's changed condition and subsequent medical treatment. She advised both parties that the pending settlement would be "put on hold" and that the law firm would be retaining the settlement documentation (release, settlement checks, the worker's compensation form) until a determination was made as to whether the additional medical treatment was related to the accident. According to Soczka, neither West Bend nor ANPAC expressed any objection or concern relative to putting the matter "on hold."

¶ 8. Under his doctor's recommendation, Marderos ultimately underwent an anterior cervical discectomy and interbody fusion on May 6, 2002. Soczka spoke with Marderos in late May and asked him to

return the documents she had sent him, including the release and settlement checks. Thereafter, Soczka learned that Marderos had suffered complications from the surgical procedure. Marderos underwent the procedure two more times in mid-June.

¶ 9. On June 12, the law firm received a letter from Marderos's doctor outlining his medical opinion. He wrote:

> [T]o a reasonable degree of medical certainty, this patient's condition of degenerative disk disease, cervical spine, and central spinal stenosis has been aggravated and accelerated as a result of the motor vehicle accident . . . . The surgical procedure was performed as a result of his degenerative changes which have been aggravated and accelerated as a result of the motor vehicle accident.

The letter was forwarded to the Nersesians. Based upon the doctor's assessment of Nersesian, it was determined that the negotiated settlement was no longer equitable under the circumstances.

¶ 10. On July 8, Guerin wrote a letter to ANPAC advising it that the Nersesians were "formally withdrawing . . . acceptance of the $17,725 settlement offer." Guerin returned the uncashed settlement checks and the release along with the letter. The release, which both Susan and Marderos signed on January 28, 2002, had the word "VOID" written across its face.

¶ 11. On October 7, 2002, ANPAC filed the underlying action against the Nersesians and West Bend seeking to enforce the December 2001 settlement. While that action was pending, Susan's employer, the Racine Unified School District (RUSD) filed its own action against Benavidez, the liable driver, and ANPAC, asserting a subrogation claim for health benefits it paid

on behalf of the Nersesians. This subrogation case was consolidated with ANPAC's action in August 2003.

¶ 12. On September 22, 2003, ANPAC filed a summary judgment motion, seeking a declaration as a matter of law that it had a valid and enforceable agreement to pay no more than $17,725 to the Nersesians and seeking dismissal of all other claims pending against it. The Nersesians opposed the motion and also moved for relief pursuant to WIS. STAT. § 806.07 (2001–02).[1] The circuit court, after hearing argument on the matter, granted ANPAC's summary judgment motion, ruling that the settlement contract was enforceable and dismissing RUSD's claim. The court also refused to consider relief under § 806.07. Both the Nersesians and RUSD appealed from the court's final order. Their appeals were consolidated by order of this court.

## STANDARD OF REVIEW

■

¶ 13. We review summary judgment decisions de novo, applying the same methodology as the circuit court. *Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315–17, 401 N.W.2d 816 (1987). That methodology is well established and need not be repeated here. *See, e.g., Lambrecht v. Estate of Kaczmarczyk*, 2001 WI 25, ¶¶ 20–24, 241 Wis. 2d 804, 623 N.W.2d 751. It is sufficient to say that summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Green Spring Farms*, 136 Wis. 2d at 315.

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version unless otherwise noted.

¶ 14. Additionally, a settlement agreement is a contract and is governed by the traditional requirements for contracts. *Degerman v. S.C. Johnson & Son, Inc.*, 875 F. Supp. 560, 562 (E.D. Wis. 1995); *State v. Peppertree Resort Villas, Inc.*, 2002 WI App 207, ¶ 13 n.8, 257 Wis. 2d 421, 651 N.W.2d 345 (noting that contract law is often applicable to settlement agreements); 66 AM. JUR. 2D *Release* § 7 (2001). Accordingly, the interpretation of a settlement agreement is a question of law reviewed independent of the circuit court. *See Lambert v. Wrensch*, 135 Wis. 2d 105, 115, 399 N.W.2d 369 (1987).

## DISCUSSION

¶ 15. On appeal the Nersesians argue that the trial court erred in concluding that they entered into a valid and enforceable settlement agreement with AN-PAC prior to the commencement of the current action. They claim that ANPAC's January 4, 2002 letter represents nothing more nor less than an offer of settlement and because they did not negotiate the checks or return the signed release to ANPAC as specified in the letter, they had not yet accepted ANPAC's offer.[2]

---

[2] On appeal, the parties also address the subrogation issue raised by the consolidated case—that being whether a plaintiff's settlement with a tortfeasor forecloses the subrogee's claim if the subrogee is not involved in the settlement. However, because we conclude that the parties had not entered into a valid and enforceable settlement agreement prior to litigation, we need not address the subrogation issue further. *See Gross v. Hoffman*, 227 Wis. 296, 300, 277 N.W. 663 (1938) (only dispositive issues need be addressed); *State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) (cases should be decided on

¶ 16. Because a settlement agreement is a contract by nature, a valid settlement agreement requires an offer, an acceptance and consideration all resulting from a meeting of the minds. *Degerman*, 875 F. Supp. at 562; 66 AM. JUR. 2D *Release* § 7. Thus, while it is true that settlement agreements are favored in the law, to create an enforceable settlement agreement there still must be an offer on one side and an acceptance that is communicated to the offerer on the other. An authorized offer from an insurance company, if properly accepted (and assuming consideration), must be held to create a binding settlement contract. *Carey v. Dairyland Mut. Ins. Co.*, 41 Wis. 2d 107, 117, 163 N.W.2d 200 (1968). However, until accepted in the mode and manner expressly provided by the terms of the offer, there remains an unaccepted offer, which cannot, in itself, be considered a binding contract. *Nelson Inc. of Wis. v. Sewerage Comm'n of Milwaukee*, 72 Wis. 2d 400, 419, 241 N.W.2d 390 (1976).

¶ 17. Applying these principles to ANPAC's offer of settlement, it is clear that the mere issuance of the checks and delivery of the release to the Nersesians did not effect a contract. ANPAC's previously-quoted January 4 offer expressly specified that the Nersesians were to sign and return the release to ANPAC prior to negotiating the settlement checks it enclosed with the offer. Thus, by its plain language, the offer was conditioned on the execution and return of the release to ANPAC. While the Nersesians did sign the release and the Nersesians did receive the two checks for the agreed

the "narrowest possible ground"). For this same reason, we need not discuss the WIS. STAT. § 806.07 issue.

upon amount, the Nersesians neither presented the checks for payment nor delivered the signed release to ANPAC. Furthermore, within one month of receiving the settlement paperwork, the Nersesians' attorney contacted the parties and explained that the Nersesians were putting the release "on hold" due to Marderos's complications, thereby communicating an unwillingness to accept the offer at the time. Having failed to properly accept ANPAC's offer by both signing and delivering the release, the Nersesians did not bind themselves to the settlement agreement.

¶ 18. ANPAC responds that the parties actually had reached a valid and enforceable agreement on December 20, 2001, when Soczka sent the letter to ANPAC confirming the settlement amount. The creation of a binding and enforceable contract is predicated on the parties' intent as derived from a consideration of the parties' words, written and oral, and their actions. *Kernz v. J.L. French Corp.*, 2003 WI App 140, ¶¶ 21–22, 266 Wis. 2d 124, 141, 667 N.W.2d 751, *review denied,* 2003 WI 140, 266 Wis. 2d 62, 671 N.W.2d 849 (Wis. Oct. 27, 2003) (No. 02–1291).

¶ 19. While Soczka's December 20, 2001 letter expresses a willingness to settle the Nersesians' claims for a total of $17,725, the correspondence represents nothing more than a mere continuation of the lengthy negotiations between the parties and not an acceptance of an offer. First, as the letter states, the Nersesians' acceptance of the settlement depended upon the approval of the worker's compensation carrier. Second, the December 20, 2001 letter clearly contemplates the execution of another document containing more material provisions—a release from ANPAC. In her letter,

Soczka wrote: "we look forward to receiving the settle-
ment checks and release from you in the near future."
Then, approximately two weeks later in her January 4,
2002 letter informing ANPAC that the worker's com-
pensation carrier had agreed to the settlement, Soczka
stated: "Our office will provide you with a conformed
copy of the [worker's compensation] document when we
return the executed release. We look forward to receiv-
ing the settlement paperwork from you in the near
future." Where, as here, it is part of the understanding
between the parties that preliminary writings are to be
followed by a formal contract containing additional
material provisions and signed by the parties, no bind-
ing or completed contract will be found. *See Milwaukee
Med. Coll., Inc. v. Marquette Univ., Inc.*, 208 Wis. 168,
170–71, 242 N.W. 494 (1932) (where during preliminary
negotiations it is understood that a formal written
agreement is to be signed, no contract is entered into);
*Goldstine v. Tolman*, 157 Wis. 141, 155–56, 147 N.W. 7
(1914) (writings will not be construed as a contract
when intended only as preliminary negotiations to be
followed by a formal contract containing other material
provisions); *Skycom Corp. v. Telstar Corp.*, 813 F.2d 810,
816 (7th Cir. 1987) ("Even if parties agree, point by
point, on all the terms of a contract, if they understand
that the execution of a formal document shall be a
prerequisite to their being bound there is no contract
until the document is executed." (Citation omitted.)).
Thus, it was not until ANPAC sent the release and the
checks to the Nersesians that an offer, which if accepted
could form the basis for an enforceable contract, was
made.[3]

---

[3] ANPAC also seems to suggest that the Nersesians' counsel
conceded at the motion hearing that a completed contract—

¶ 20. In the alternative, ANPAC maintains that the Nersesians' retention of the settlement checks for approximately seven months was unreasonable and constitutes an accord and satisfaction as a matter of law. ANPAC relies upon *Hoffman v. Ralston Purina Co.*, 86 Wis. 2d 445, 448–49, 452, 273 N.W.2d 214 (1979), where our supreme court concluded that an offeree's retention of an uncashed settlement check for a period of seven months was unreasonable and constituted an accord and satisfaction.

¶ 21. Contrary to ANPAC's assertions, *Hoffman* does not establish a bright-line rule that retaining a check for seven months is unreasonable and automatically results in a contract by accord and satisfaction. Rather, *Hoffman* teaches that whether a check is held for an unreasonable length of time depends on the circumstances of the dispute and the status of the negotiations between the adversary parties. *Id.* at 456. In *Hoffman*, the offeree had retained the settlement check for seven months, acquiesced in the receipt of a credit memorandum which had the effect of reducing to zero the offeree's outstanding balance with the offerer and maintained complete silence over those seven months. *Id.* at 456–57. It was for these reasons that the supreme court determined that the retention of the check was unreasonable.

¶ 22. Here, unlike the offeree in *Hoffman*, the Nersesians did not remain silent nor did they otherwise acquiesce in the benefits of ANPAC's offer. Instead, the

---

offer, acceptance and consideration—had occurred as of December 20, 2001. We have reviewed the record and find no such unequivocal concession.

Nersesians chose not to return the release, a condition of acceptance ANPAC imposed. Then, within weeks of receiving the settlement paperwork, they contacted ANPAC and the worker's compensation carrier and notified them that Marderos's condition had changed and the Nersesians were putting the settlement "on hold." This communication, coupled with the failure of the Nersesians to return the release and cash the checks, put ANPAC on notice that the Nersesians were not willing to accept its offer of settlement. ANPAC then could have requested the return of the checks and release or availed itself of its right to stop payment on the checks. Instead, ANPAC acquiesced to the Nersesians' retention of all of the settlement paperwork. Because the Nersesians fully explained the grounds for their retention of the check and release within weeks of receiving them and ANPAC acquiesced in that retention, we see no reason to hold that the Nersesians had agreed to accept an offer of accord which they had expressly rejected.

*By the Court.*—Order reversed.