**POWDER HORN CONSTRUCTORS, INC., and St. Paul Fire and Marine Insurance Company, Petitioners,**

v.

**CITY OF FLORENCE, Respondent.**

**No. 85SC502.**

Supreme Court of Colorado,
En Banc.

April 25, 1988.

Rehearing Denied June 6, 1988.

Conover, McClearn & Heppenstall, P.C., Hugh J. McClearn, Catherine A. Lemon, Denver, for petitioners.

Law Office of Robert F.T. Krassa, P.C., Robert F.T. Krassa, Pueblo, for respondent.

Charles E. Grover, Denver, for amicus curiae Colorado Contractors' Ass'n, Inc.

KIRSHBAUM, Justice.

In *City of Florence v. Powder Horn Constructors, Inc.*, 716 P.2d 143 (Colo.App. 1985), the Court of Appeals affirmed a trial court judgment ordering forfeiture of a bid bond executed for the benefit of the City of Florence (the City) by the petitioners, Powder Horn Constructors, Inc. (Powder Horn) and Powder Horn's surety, St. Paul Fire and Marine Insurance Co. (St. Paul). The City filed a civil action requesting the forfeiture as damages for Powder Horn's refusal, as low bidder, to accept the City's award of a public improvement construction contract. Powder Horn asserted as a defense a right to equitable relief from the provisions of the bond on the ground that it had rescinded its bid; the trial court rejected this claim. The Court of Appeals held that under certain circumstances a low bidder for a public construction contract may rescind its bid, but affirmed the trial court's judgment. Having granted certiorari to review that decision, we reverse and remand with directions.

I

On December 24, 1981, the City published an advertisement for sealed bids for construction work on a water treatment facility. The bids were initially due on January 14, 1982, but that date was subsequently extended to January 19, 1982. On January 6, 1982, Powder Horn obtained a set of documents from the City detailing the engineering specifications for the project.

On January 19, 1982, Powder Horn submitted a bid of $699,500 for the project. As required by the terms of the bid documents, it also submitted a bid bond in the

sum of five percent of its total bid.[1] When the bids were publicly opened late that same day, Powder Horn was identified as the low bidder. The second lowest bid price was $754,330.

The next day, January 20, Paul Gilbert, the City's consulting engineer in charge of administering the project, telephoned Michael O'Clair, a Powder Horn estimator, and advised him that in tabulating the bids he had found one item in Powder Horn's bid that appeared to be substantially low in view of the other bids submitted. Gilbert suggested that Powder Horn might want to review that particular item.

On January 21, Powder Horn's president, Cletus Donahue, informed Gilbert by telephone that Powder Horn had mistakenly omitted from its bid the sum of $66,660, representing the cost of one major item, and that the bid was therefore being withdrawn. On that same day, Donahue also wrote a letter to Gilbert's engineering firm in which he stated that a subtotal from one worksheet inadvertently had been omitted from the final bid amount, advised that the bid and the bid security were being withdrawn and offered to meet with the consulting engineers, the City attorney or other officials to demonstrate that the omission was an honest error.

On February 1, 1982, the City, through its city council, voted to award the contract to Powder Horn for the amount of $699,500. On February 4, Donahue sent a letter to Gilbert's engineering firm stating that Powder Horn would not accept the award of the contract. The City then awarded the contract to the second lowest bidder. That bidder accepted the contract and commenced work.

The City filed this action against Powder Horn and St. Paul, asserting a right to the amount of the bid bond as liquidated damages for Powder Horn's failure to execute the construction contract. The complaint alleged that although the City's actual damages equaled $54,830, the difference between Powder Horn's bid and the second lowest bid, Powder Horn's liability was limited to the amount of the bid bond. Pow-

der Horn asserted as a defense that it had rescinded its bid and therefore could not be held liable under the terms of the bid bond.

The trial court found that Powder Horn had not exercised reasonable care in preparing its bid. Based on this finding, it determined that Powder Horn was liable to the City in the amount of the bid bond. The trial court also determined that Powder Horn's conduct constituted a unilateral mistake, that the mistake was material, that requiring Powder Horn to perform the contract would be unconscionable, and that Powder Horn had failed to establish that the City would not be prejudiced by the withdrawal of Powder Horn's bid.

In affirming the trial court's judgment, the Court of Appeals recognized that in some circumstances a bidder may be permitted to rescind a bid submitted for a public construction contract because of a mistake in calculating the bid. The Court of Appeals concluded that such a remedy is available only when the bidder proves by a preponderance of the evidence that: "(1) the mistake relates to a material feature of the contract; (2) it occurred despite the exercise of reasonable care; and (3) the public authority can be placed in status quo." *City of Florence v. Powder Horn Constructors, Inc.*, 716 P.2d 143, 144 (Colo. App.1985). It held that Powder Horn could not rescind the bid because it had not exercised reasonable care in preparing it. The Court of Appeals also observed that a public entity which has not changed its position in reliance on a mistaken bid has suffered no actual damages and is able to maintain the status quo merely by accepting the second lowest bid "since it has lost only what it sought to gain by taking advantage of the mistake." *Id.* at 145.

We agree with the conclusion of the Court of Appeals that under certain circumstances a bidder submitting a bid for a public construction contract may be permitted to rescind the bid prior to its acceptance if it reflects a material mistake of fact. We do not agree, however, that the exercise of reasonable care is an appropriate

1. The bond for Powder Horn's $699,500 bid was thus $34,975.

factor upon which to condition this right of rescission.

## II

This case falls into that narrow class of public construction bid cases in which an issue of mistaken bid arises when, prior to the public entity's acceptance of the bid, the parties discover that the bid contains a material mathematical or clerical error. Powder Horn argues that under such circumstances the bidder should be allowed to withdraw its bid automatically without penalty. A substantial body of law supports Powder Horn's argument, in effect concluding that where a bidder submits a bid containing a material mistake of fact and the bid is apparently accepted there has not been any meeting of the minds because the bid accepted by the public entity is not the bid intended by the bidder. *E.g., Moffett, Hodgkins & Clarke Co. v. Rochester,* 178 U.S. 373, 20 S.Ct. 957, 44 L.Ed. 1108 (1900); *Marana Unified School Dist. No. 6 v. Aetna Cas. & Sur. Co.,* 144 Ariz. 159, 696 P.2d 711 (Ariz.App.1984); *Regional School Dist. No. 4 v. United Pac. Ins. Co.,* 4 Conn.App. 175, 493 A.2d 895, *certif. denied,* 196 Conn. 813, 494 A.2d 907 (1985); *Baltimore County v. John K. Ruff, Inc.,* 281 Md. 62, 375 A.2d 237 (1977); *Mississippi State Bldg. Comm'n v. Becknell Constr., Inc.,* 329 So.2d 57 (Miss.1976); *City of Syracuse v. Sarkisian Bros., Inc.,* 87 A.D.2d 984, 451 N.Y.S.2d 945, *aff'd,* 57 N.Y.2d 618, 454 N.Y.S.2d 71, 439 N.E.2d 880 (1982); *Arcon Constr. Co. v. State,* 314 N.W.2d 303 (S.D. 1982); *State Highway Comm'n v. Canion,* 250 S.W.2d 439 (Tex.Civ.App.1952); *see also* D. Dobbs, *Handbook on the Law of Remedies* § 11.4 (1973) (observing that, where bid contains material mistake, failure to grant bidder relief results in public authority receiving more than it was seeking in the bargain). In addition, many courts, commentators and legislative bodies have either explicitly or implicitly recognized that a mathematical or clerical error yields an unintended bid, while an error in judgment, such as an error in estimating the number of hours of work necessary to complete a project, yields precisely the bid intended and is not deemed a mistaken bid. *E.g., Boise Junior College Dist. v. Mattefs Constr. Co.,* 92 Idaho 757, 450 P.2d 604 (1969); *State v. Hensel Phelps Constr. Co.,* 634 S.W.2d 168 (Mo.1982); *Jobco, Inc. v. County of Nassau,* 129 A.D.2d 614, 514 N.Y.S.2d 108 (1987); *Muncy Area School Dist. v. Gardner,* 91 Pa.Commw. 406, 497 A.2d 683 (1985); *see generally* 10 E. McQuillin, *The Law of Municipal Corporations* § 29.82 (3d ed. 1981); Rudland, *Rationalizing the Bid Mistake Rules,* 16 Pub.Cont.L.J. 446 (1986); *see also M.F. Kemper Constr. Co. v. City of Los Angeles,* 37 Cal.2d 696, 235 P.2d 7 (1951), *superseded by statute,* Cal.Pub.Cont.Code § 5103 (West 1985) (where mistake made bid materially different than intended, relief available for mistake in filling out bid form, but not for mistake in judgment); N.C.Gen.Stat. § 143–129.1 (1987) (if clerical mistake, agency shall allow withdrawal of bid without forfeiture of bid security); Model Procurement Code for State and Local Governments § 3–202(6) commentary (4) (1979) (observing that bid withdrawal should be permitted where there is reasonable proof of a material mistake of fact and intended bid is not ascertainable with reasonable certainty).[2] It is undisputed here that Powder Horn's error was not an error in judgment. Under these circumstances, there is merit to Powder Horn's position that no agreement was or could have been consummated at the time the bids were opened.

---

**2.** Similarly, the contract document entitled "Information for Bidders" advised bidders here that a bidder's judgment errors respecting the nature and quantity of work to be performed would not relieve the bidder from its obligations; the contract documents were silent respecting the resolution of clerical errors.

This court has recognized that traditionally a contract could not be avoided on the basis of an error in value judgment by one party, unless the other party knew or had reason to know of the error. *In re Marriage of Manzo,* 659 P.2d 669 (Colo.1983) (relying on J. Calamari & J. Perillo, *Contracts* § 9–27 (2d ed. 1977)). As Calamari and Perillo point out, while rescission is not allowed for mistakes in judgment, the requirement that the other party know or have reason to know of the mistake has been substantially eroded. J. Calameri & J. Perillo, *Contracts* § 9–27 (2d ed. 1977).

However, this legal analysis ignores an important distinction that has emerged in the law of public contracts—the assumption that bids for public construction contracts are generally considered to be irrevocable upon opening. *See* Jones, *The Law of Mistaken Bids*, 48 U.Cin.L.Rev. 43, 45 & n. 13 (1979). This principle serves to protect the integrity of the bidding process by encouraging the preparation of accurate bids, reducing possibilities of collusion and artificial bidding practices among contractors, and promoting predictability and certainty in the process of expending public funds.

Some jurisdictions have determined to further these policies by adopting a rule that generally prohibits rescission of a bid for a public construction contract at any time after the bids are opened. *E.g., Anco Constr. Co. v. City of Wichita*, 233 Kan. 132, 660 P.2d 560 (1983); *City of Columbus v. Independent Towel Supply Co.*, 51 Ohio App.2d 250, 367 N.E.2d 915 (1977). Jurisdictions adopting this restrictive view are in the minority, however. *See generally* Rudland, *Rationalizing the Bid Mistake Rules*, 16 Pub.Cont.L.J. 446 (1986). Most jurisdictions have recognized that other important policies are also involved in the question of whether and under what circumstances a bidder on a public construction contract should be permitted to withdraw the bid. These policies include a reluctance to enforce penal forfeitures, a hesitancy to promote windfall profits in the absence of any change of position and a concern that agreements based on unilateral or mutual mistake may not represent that firm meeting of the minds that is essential to the law of enforceability of contracts. *See generally* Jones, *The Law of Mistaken Bids*, 48 U.Cin.L.Rev. 43 (1979); Rudland, *Rationalizing the Bid Mistake Rules*, 16 Pub.Cont.L.J. 446 (1986).

■ In view of the competing policy concerns raised in this kind of case, courts recognizing the right of a bidder to rescind a bid for a public construction contract have generally done so in the context of claims for equitable relief. *See generally* Rudland, *Rationalizing the Bid Mistake*

*Rules,* 16 Pub.Cont.L.J. 446 (1986). The issue for these courts, as the Court of Appeals recognized, is reduced to the question of identifying the circumstances and the appropriate factors that will support a bidder's request for relief from the consequences of a mistaken bid. We agree with the conclusion of the Court of Appeals that the more fair and responsible policy is to recognize that prior to the public entity's acceptance of a bid for a public construction project a bidder may in some circumstances obtain equitable relief from the consequences of a bid containing a mathematical or clerical error.

The Court of Appeals relied principally on the case of *John J. Calnan Co. v. Talsma Builders, Inc.*, 67 Ill.2d 213, 10 Ill.Dec. 242, 367 N.E.2d 695 (1977), in adopting a test that includes a requirement of proof of non-negligence to justify rescission of a public construction project bid prior to any acceptance thereof. *Calnan* arose in circumstances quite different from the factual context of this case, however. In *Calnan*, a subcontractor, John J. Calnan Co., filed an action to rescind a contract it already had entered into with Talsma Builders, Inc., a general contractor. Talsma had invited a rush bid from Calnan for the plumbing work on a public construction contract because a previous subcontractor had failed to obtain a surety bond. Calnan submitted a bid of $237,000 on May 14, 1974. The next day Calnan informed Talsma that the bid failed to reflect a $40,000 cost item for bathtubs. The parties subsequently executed an agreement based on the enhanced bid, but Calnan refused to provide a performance bond when requested to do so. In mid-September, after commencing work on the project, Calnan discovered that its original bid did not include a $31,000 cost item for the entire water supply system for the project. Calnan submitted a bill to Talsma for this sum as well as for sums allegedly due as periodic payments for work performed; when Talsma refused payment, Calnan filed an action to rescind the construction contract. Applying a three-part test to those facts, the Illinois Supreme Court concluded that Cal-

nan was not entitled to rescind the contract.

This case presents far different circumstances. The City was aware of the "possible" mistake in Powder Horn's bid before Powder Horn was, and Powder Horn communicated its intention to rescind its bid immediately, prior to any change of position by the City. The City did not accept the bid until later—at a time when it had full knowledge of both the mistake and the fact that because of the mistake Powder Horn had withdrawn its bid. No contract for construction of the project was ever executed by the parties, and there was no delay, no surprise, and no justifiable reliance by the City at the time it elected to accept the bid.

Although *Calnan* is distinguishable from this case, the question remains whether the formula articulated by the Illinois Supreme Court in that decision should be adopted in Colorado. That formula, as stated by the Court of Appeals, grants a bidder equitable relief from its bid if the following criteria are met:

> (1) the mistake relates to a material feature of the contract; (2) it occurred despite the exercise of reasonable care; and (3) the public authority can be placed in status quo.

*City of Florence v. Powder Horn Constructors, Inc.*, 716 P.2d 143, 144 (Colo. App.1985). Our inquiry is of course shaped by the particular circumstances of this case —the fact that Powder Horn's decision to rescind its bid was made promptly upon discovery of the mistake, at a time when the City had full knowledge of the mistake and prior to the City's decision to accept the bid. We are not persuaded that in this context the imposition of a requirement that the bidder establish freedom from negligence substantially furthers policies of encouraging fair bidding practices. To the contrary, such requirement would in these limited circumstances severely undermine policies of fostering fair dealing and certainty among contracting parties essential to any contract negotiation process. *See* Jones, *The Law of Mistaken Bids*, 48 U.Cin.L.Rev. 43 (1979).

The Court of Appeals concluded that requiring Powder Horn to prove it was not negligent in the preparation of its mistaken bid served to protect the integrity of the bidding process, to foster consistency in bid preparation throughout the state, and to discourage or prevent fraud and collusion. *City of Florence v. Powder Horn Constructors, Inc.*, 716 P.2d at 145. Such salutary policies should, of course, be encouraged. However, requiring a bidder to demonstrate freedom from negligent conduct when the bid has not been accepted and the bid contains a mechanical error, as distinguished from an error of judgment, will significantly restrict the availability of this equitable remedy in circumstances wherein recognition of the remedy would not undermine those policies. Moreover, rejection of the negligence standard in these limited circumstances will foster other important policies of encouraging fair dealing by all parties to the bidding process.

The very term "mistake" generally connotes some degree of negligent conduct. *See Mississippi State Bldg. Comm'n v. Becknell Constr., Inc.*, 329 So.2d 57 (Miss. 1976); Jones, *The Law of Mistaken Bids*, 48 U.Cin.L.Rev. 43, 70 (1979). In most circumstances it would be illogical, if not impossible, to require a bidder who has made a mistake in calculating a bid to establish that the mistake was one most reasonable bidders would make under the same or substantially similar circumstances.[3] Requiring proof of freedom from neg-

---

3. In recognition of such a problem, the Restatement (Second) of Contracts section 157 (1979) provides as follows:

§ 157. **Effect of Fault of Party Seeking Relief**

A mistaken party's fault in failing to know or discover the facts before making the contract does not bar him from avoidance or reformation under the rules stated in this Chapter, unless his fault amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.

Comment *a* to section 157 states in pertinent part as follows:

*a. Rationale.* The mere fact that a mistaken party could have avoided the mistake by the exercise of reasonable care does not preclude either avoidance (§§ 152, 153) or refor-

ligence focuses substantial attention on the cause of the mistake; the question of the availability of equitable relief from a mistaken bid should focus primarily on the consequences of the mistake. Furthermore, the three-part test articulated in *Calnan* would require a bidder to prove that its mistake was of sufficient magnitude to be considered material to the contract yet, incongruously, that the mistake was not the result of negligence.[4] *See* A. Corbin, *Corbin on Contracts* §§ 608, 609 (1960) (noting that an error in computing a bid invariably involves at least negligence).

Numerous courts and commentators have concluded that in public construction contract cases in which a bidder seeks equitable relief from bond forfeiture provisions because of a mistaken bid, the fundamental issue is whether the bidder made an honest or good faith mistake and any question of gross or extreme negligence of the bidder should be considered only as evidence of the bidder's lack of good faith. *E.g., Marana Unified School Dist. No. 6 v. Aetna Cas. & Sur. Co.,* 144 Ariz. at 159, 696 P.2d at 711; *Naugatuck Valley Dev. Corp. v. Acmat Corp.,* 10 Conn.App. 414, 523 A.2d 924 (1987); *Mississippi State Bldg. Comm'n v. Becknell Constr., Inc.,* 329 So.2d 57 (Miss.1976); *Balaban–Gordon Co. v. Brighton Sewer Dist. No. 2,* 41 A.D.2d 246, 342 N.Y.S.2d 435 (1973); *State v. Union Constr. Co.,* 9 Utah 2d 107, 339 P.2d 421 (1959); Jones, *The Law of Mistaken Bids,* 48 U.Cin.L.Rev. 43, 80 (1979); Rudland, *Rationalizing the Bid Mistake Rules,* 16 Pub.Cont.L.J. 446, 455 (1986); *cf. BCM Corp. v. United States,* 2 Cl.Ct. 602

(1983) (under federal law, where public agency is on actual or constructive notice of bidder's unreasonable mistake and accepts bid without verifying its accuracy, presumption arises that agency acted in bad faith in attempt to take advantage of bidder); *see* § 24–101–104, 10 C.R.S. (1982) (imposing a good faith standard upon all parties involved in state procurement activities); *see also* A. Corbin, *Corbin on Contracts* § 609 (1960) (bidding process will retain stability by requiring bidder to prove substantial mistake). This approach recognizes that a bidder should not be allowed to rescind a mistaken bid if the bid were made in bad faith and emphasizes the desirability of ensuring that public projects proceed on the basis of accurate cost estimates. A contrary rule would encourage manipulative bidding practices and undermine the stability of the bidding process. Furthermore, evenhanded application of a good faith standard ensures fair treatment of all parties involved in dealings with municipal authorities, thereby enhancing the integrity of the bidding process.

In this context, it is noteworthy that in adopting the Procurement Code, §§ 24–101–101 to 24–112–101, 10 C.R.S. (1982) (the Code), mandatorily applicable to state executive agencies contracting for construction projects on the basis of competitive bidding, the General Assembly has indicated that one of the public policies to be served by the provisions regulating the awarding of bids for public projects is that of ensuring the fair and equitable treat-

mation (§ 155). Indeed, since a party can often avoid a mistake by the exercise of such care, the availability of relief would be severely circumscribed if he were to be barred by his negligence. Nevertheless, in extreme cases the mistaken party's fault is a proper ground for denying him relief for a mistake that he otherwise could have avoided. Although the critical degree of fault is sometimes described as "gross" negligence, that term is not well defined and is avoided in this Section as it is in the Restatement, Second, of Torts. Instead, the rule is stated in terms of good faith and fair dealing.... *See also* Restatement of Restitution § 59 (1936) (person who mistakenly conferred benefit upon another is not precluded from restitution where

mistake was due to lack of care); D. Dobbs, *Handbook on the Law of Remedies* § 11.2 (1973) (concluding that a negligent party should be relieved from a mistake unless the nonmistaken party suffers prejudice); Rabin, *A Proposed Black–Letter Rule Concerning Mistaken Assumptions in Bargain Transactions,* 45 Tex.L.Rev. 1273, 1278–1279, 1283 (1967) (concluding that the better rule is that relief from mistake should depend on the inequality of the exchange rather than the negligence of the mistaken party).

4. Here, the trial court ruled that the omission of "the two relatively large items" from the bid was a material mistake, and then stated that a reasonable contractor should not have omitted such "considerable amounts."

ment of all parties to the bidding process. *See* § 24–101–102. Although the Code does not apply to this bidding process, its policy of ensuring good faith negotiation of public contracts is notable.[5] The degree of negligence exhibited by a bidder may well bear upon whether a bid was made in good faith, and in that respect an inquiry into the cause of the mistake may be material to the ultimate determination of whether equitable relief from a mistaken bid should be granted.[6] However, when a bid containing a clerical or mathematical error is proffered in good faith, the fact that the mistake resulted from negligent conduct should not foreclose the ability to rescind the bid prior to acceptance thereof if no harm results from the rescission.

The City argued that failure to require a bidder to demonstrate freedom from negligent conduct as a condition to the exercise of any right to rescind a mistaken bid would reward careless bid preparation. However, in the competitive environment of public contracting a bidder invariably has a compelling incentive to bid accurately—to submit a bid in an amount lower than that at which the bidder can realistically perform the work is tantamount to submitting no bid at all. *See* Rudland, *Rationalizing the Bid Mistake Rules,* 16 Pub.Cont.L.J. 446, 455 (1986) (observing that a bidder gains nothing by withdrawing its bid). Far from being rewarded, a bidder allowed to rescind its bid prior to any acceptance thereof loses any possibility of reaping profit from fulfillment of the construction contract. In contrast, careless bid preparation is actually rewarded where the bidding process fails to closely circumscribe a bidder's ability to amend its bid after opening but before acceptance. *E.g.,* Model Procurement Code for State and Lo-

cal Governments § 3–202(6) commentary (2), (3) (1979) (bidder should not be allowed to amend bid after opening unless mistake is not one of judgment and intended bid is clearly evident from bid documents).

In reviewing the competing policy considerations presented here, we conclude that, in the absence of controlling legislation, a bidder for a public construction contract who submits a bid containing a mistake may rescind the bid prior to its acceptance if the bidder establishes by a preponderance of the evidence that the mistake is of a clerical or mathematical nature, that the mistake was made in good faith and relates to a material aspect of the bid, and that the public authority did not rely to its detriment on the mistaken bid. If a bidder proves all of these elements, rescission of the bid should be granted because the bid apparently accepted was not the bid intended and, therefore, was not a valid bid. If, however, the bidder fails to prove each of the elements of the equitable test, the bid submitted must be deemed the bid intended and the public entity may recover proven damages to the extent the bidder fails to perform its contractual obligations—such as the public entity's loss of bargain in being forced to forego the valid low bid and award the contract to the next lowest bidder. Such test will not undermine the integrity of the bid process, will promote fair dealing by all parties to that process and will promote contractual certainty by encouraging early discovery and disclosure of material mistakes in bids.

In this case, prior to advertising for bids the City's consulting engineer estimated the total cost of the project to be $890,000 —well above Powder Horn's bid of $699,500. Moreover, the City alerted Powder

---

**5.** Section 24–105–201, 10 C.R.S. (1982), requires the execution of a bid bond equal to five percent of the amount of bid for all construction contracts where the procurement officer estimates the contract price to exceed fifty thousand dollars. However, the City has not adopted this provision of the Procurement Code; thus, the provision is inapplicable to this case, as the trial court found.

**6.** The City does not assert that Powder Horn's conduct constituted fraud, nor does a review of

the record disclose any indication of such. However, even in cases involving allegations of fraud the question of whether an honest mistake of a clerical or mathematical nature is present is subject to an objective determination based on a review of the bid preparation documents. *See, e.g., City of Syracuse v. Sarkisian Bros., Inc.,* 87 A.D.2d 984, 451 N.Y.S.2d 945, *aff'd,* 57 N.Y.2d 618, 454 N.Y.S.2d 71, 439 N.E. 2d 880 (1982).

Horn of a possible mistake when it reviewed the bids submitted and noted that on one item Powder Horn had bid $169,500, the next lowest bidder had bid $216,600 and the remaining eight bidders had bid from $230,000 to $330,000. Furthermore, Powder Horn notified the City of the nature of its mistake and its intent to withdraw the bid prior to the awarding of the contract, when no action had yet been taken in reliance on Powder Horn's inaccurate bid and when other bids were still available to the City.

These circumstances reveal an absence of one of the basic policies underlying the enforcement of contracts—if one party creates reasonable expectations in the other party, those expectations should be fulfilled, either by performance or by award of damages. *See* D. Dobbs, *Handbook on the Law of Remedies* § 11.4 (1973). Here, the City did not act upon any reasonable expectations, but rather sought to take advantage of Powder Horn's mistake and gain a windfall profit. If Powder Horn was acting in good faith, requiring it to forfeit its bid bond even though the City knew of the mistake prior to accepting the bid would contravene fundamental principles of fairness and encourage bad faith negotiations subsequent to bid opening. *See Jackson Enters., Inc. v. Maguire*, 144 Colo. 164, 355 P.2d 540 (1960) (equity will not allow a party to knowingly take advantage of a mistake of another); Model Procurement Code for State and Local Govern-

ments § 3–202(6) commentary (6) (1979) (a suspected mistake can give rise to a duty on the part of the public authority to seek confirmation of bid; bidder who demonstrates mistake should be allowed to correct or withdraw bid).[7]

It is undisputed that the City did not solicit new bids when Powder Horn withdrew its bid and, therefore, incurred no administrative costs of rebidding the project. *Cf. Board of Regents of Murray State Normal School v. Cole*, 209 Ky. 761, 273 S.W. 508 (1925) (withdrawing bidder held liable to public authority for costs of rebidding the contract). The City ultimately awarded the contract to the next lowest bidder, which bid was, assuming rescission of Powder Horn's bid, the lowest valid bid. Thus in this case the City did not change its position in reliance on the mistaken bid. *E.g., Regional School Dist. No. 4 v. United Pac. Ins. Co.*, 4 Conn.App. 175, 493 A.2d 895 (public authority is unharmed by mistake where notified of mistake prior to award of contract), *certif. denied*, 196 Conn. 813, 494 A.2d 907 (1985); *Boise Junior College Dist. v. Mattefs Constr. Co.*, 92 Idaho 757, 450 P.2d 604 (1969) (same conclusion); *Mississippi State Bldg. Comm'n v. Becknell Constr., Inc.*, 329 So.2d 57 (Miss.1976) (same conclusion); *Smith & Lowe Constr. Co. v. Herrera*, 79 N.M. 239, 442 P.2d 197 (1968) (same conclusion); *Balaban–Gordon Co. v. Brighton Sewer Dist. No. 2*, 41 A.D.2d 246, 342 N.Y.S.2d 435

7. The Court of Appeals concluded that the mistake at issue in this case was unilateral in nature. *City of Florence v. Powder Horn Constructors, Inc.*, 716 P.2d 143, 144, 145 (Colo.App. 1985). Often the classification of a mistake as unilateral or mutual may be difficult and not particularly helpful in terms of indicating the appropriate solution. *E.g.,* A. Corbin, *Corbin on Contracts* § 608 (1960); D. Dobbs, *Handbook on the Law of Remedies* § 11.4 (1973) (noting that while a mistaken bid is generally caused by one party, it is often true that both the bidder and the offeree believe the bid was accurately prepared, thus presenting a mutual rather than unilateral mistake); Jones, *The Law of Mistaken Bids*, 48 U.Cin.L.Rev. 43, 48 & n. 36 (1979) (noting that the social policy of protecting individuals from the imposition of contractual obligations they did not intend is equally present in cases of mutual mistake and of unilateral mistake where the offeree is aware of the error).

The Restatement (Second) of Contracts § 153 (1979) states that where a mistake of one party occurs as to a basic assumption the contract is voidable only if enforcement of the contract would be unconscionable or the other party had reason to know of the mistake. The requirement of unconscionability or reason to know assists in ensuring that avoidance of the contract will not unreasonably disappoint the expectations of the party not causing the mistake. *See* Restatement (Second) of Contracts § 153 comment c (1979); *see also* 2 G. Palmer, *The Law of Restitution* § 12.20 (1978) (observing that the courts have a tendency to find that the offeree had reason to know of the mistake when the size of the error is substantial). In this case the evidence indicates the City's representative was aware of the probability that a mistake had been made as soon as the bids were tabulated; in fact, the representative notified Powder Horn of the problem immediately thereafter.

(1973) (same conclusion); *see also City of Baltimore v. De Luca–Davis Constr. Co.,* 210 Md. 518, 124 A.2d 557 (1956) (observing that the courts were virtually unanimous in permitting withdrawal of bids where public authority was notified of mistake prior to award of contract); *see also* A. Corbin, *Corbin on Contracts* § 609 (1960) (offeree is unharmed where notice of mistake given before acceptance of bid).

Of course, the factual context in other cases may support the conclusion that the public entity did change its position in reliance on the mistaken bid. For example, expenses of a decision to rebid a contract or costs of delays in completion of a construction project may be found directly attributable to the mistaken bid. The question of whether a public entity changes its position in reliance on a mistaken bid for purposes of determining whether the bidder may rescind the bid is distinct from the issue of what damages a public entity might be entitled to recover if the bidder is not entitled to rescind the bid.

Because neither the trial court nor the parties had an opportunity to address the issues in this case under the appropriate legal standard, a remand is necessary to provide that opportunity. However, as the Court of Appeals concluded, the City did not change its position in reliance on the mistaken bid, and it is undisputed that the mistake was of a material clerical nature. Thus, the only element to be addressed on remand is whether Powder Horn's mistake was made in good faith. If Powder Horn fails to establish this element, its equitable defense falls, its bid must be deemed valid and, therefore, the City may recover pursuant to the terms of the bid bond as a result of Powder Horn's failure to carry out its obligations as low bidder.[8] However, if Powder Horn establishes a good-faith mistake, it will be entitled to rescind the bid and the City can recover no damages.

**III**

The City argues that whatever standard might be applied to Powder Horn's equitable claim, the parties agreed that if Powder Horn was designated the low bidder and subsequently failed to execute a construction contract Powder Horn's bid bond was payable as liquidated damages. We find this argument unpersuasive.

A fundamental rule of contract law is that the court should strive to ascertain and effectuate the mutual intent of the parties. *Martinez v. Continental Enters.,* 730 P.2d 308 (Colo.1986); *Pepcol Mfg. Co. v. Denver Union Corp.,* 687 P.2d 1310 (Colo.1984); *Griffin v. United Bank of Denver,* 198 Colo. 239, 599 P.2d 866 (1979). Intent may be determined by reference to separate ancillary instruments. *Town of Estes Park v. Northern Colo. Water Conservancy Dist.,* 677 P.2d 320 (Colo.1984). A bond, like other contracts, should be construed to give effect to the intent of the parties, and reference may be made to the bond and other instruments to which the bond refers to ascertain intent. *General Ins. Co. of Am. v. City of Colorado Springs,* 638 P.2d 752 (1981); *Central Sur. & Ins. Corp. v. American Emp. Ins. Co.,* 150 Colo. 6, 370 P.2d 455 (1962); *Covey v. Schiesswohl,* 50 Colo. 68, 114 P. 292 (1911).

The essential elements of a liquidated damages provision are: (1) that the parties intended to liquidate damages; (2) that at the time of contracting the amount of damages specified was a reasonable estimate of the presumed actual damages that the breach would cause; and (3) that at the time of contracting it was difficult to ascertain the amount of actual damages that would result from a breach. *Rohauer v. Little,* 736 P.2d 403 (Colo.1987); *O'Hara Group Denver, Ltd. v. Marcor Hous. Sys., Inc.,* 197 Colo. 530, 595 P.2d 679 (1979); *Perino v. Jarvis,* 135 Colo. 393, 312 P.2d 108 (1957). An obligation created by a

---

**8.** Here, the only damages alleged by the City are those flowing from loss of the bargain in having the project constructed for the price bid by Powder Horn, damages measured by the difference between Powder Horn's allegedly valid bid and the second lowest bid. Because the amount of these alleged damages exceeds the amount of the penal bond executed by the parties, if the City is entitled to recover damages, it may recover the full amount of the bid bond. *See infra* note 12 and accompanying text.

bond agreement will be viewed as a provision for a penalty, rather than as a liquidated damages provision, unless the bond, or other instruments to which it refers, shows that the parties intended otherwise. *Turck v. Marshall Silver Mining Co.*, 8 Colo. 113, 5 P. 838 (1884); *Moore v. Kline*, 26 Colo.App. 334, 143 P. 262 (1914). Here, the bid bond provided in pertinent part as follows:

### BID BOND

... [W]e, the undersigned, POWDER HORN CONSTRUCTORS, INC.... as Principal, and ST. PAUL FIRE AND MARINE INSURANCE COMPANY as Surety, are hereby held and firmly bound unto CITY OF FLORENCE, COLORADO as OWNER in the penal sum of Five Percent (5%) of the Total Amount of Bid

....

The Condition of the above obligation is such that whereas the Principal has submitted to CITY OF FLORENCE, COLORADO a certain BID, attached hereto and hereby made a part hereof to enter into a contract in writing, for the Florence–Coal Creek–Williamsburg Regional Water System—Schedule 3 NOW, THEREFORE,

> (a) If said BID shall be rejected, or
> (b) If said BID shall be accepted and the Principal shall execute and deliver a contract in the Form of Contract attached hereto (properly completed in accordance with said BID) and shall furnish a BOND for his faithful performance of said contract, and for the payment of all persons performing labor or furnishing materials in connection therewith, and shall in all other respects perform the agreement created by the acceptance of said BID,

then this obligation shall be void, otherwise the same shall remain in force and effect; it being expressly understood and agreed that the liability of the Surety for any and all claims hereunder shall, in no event, exceed the penal amount of this obligation as herein stated....

Conspicuously absent is any mention of "liquidated damages," while the five percent bond is twice referred to as "penal" in nature.

The bid itself provided in pertinent part as follows:

### BID

....

In compliance with your Advertisement for Bids, BIDDER hereby proposes to perform all WORK for the construction of Florence–Coal Creek–Williamsburg Regional Water System—Schedule 3 in strict accordance with the CONTRACT DOCUMENTS, within the time set forth therein, and at the prices stated below.

....

BIDDER hereby agrees to commence WORK under this contract on or before a date to be specified in the NOTICE TO PROCEED and to fully complete the PROJECT within 210 consecutive calendar days thereafter. BIDDER further agrees to pay as liquidated damages, the sum of $200.00 for each consecutive calendar day thereafter....

Again, no mention is made of "liquidated damages" in reference to the bid bond, although the bid clearly provides that the bidder pay liquidated damages of $200 per day for dilatory completion of the project.

The contract documents also included an informational document.[9] This document

---

9. This document provided in pertinent part as follows:

INFORMATION FOR BIDDERS

....

The OWNER may waive any informalities or minor defects or reject any and all BIDS. Any BID may be withdrawn prior to the above scheduled time for the opening of BIDS or authorized postponement thereof.... No BIDDER may withdraw a BID within 60 days after the actual date of the opening thereof. Should there be reasons why the contract cannot be awarded within the specified period, the time may be extended by mutual agreement between the OWNER and the BIDDER.

BIDDERS must satisfy themselves of the accuracy of the estimated quantities in the BID Schedule by examination of the site and a review of the drawings and specifications

does not suggest that the five percent bid bond was intended by either party to represent an agreed amount of liquidated damages or that the actual damages from a bidder's failure to execute a construction contract might be regarded as the difference between a withdrawn low bid and the next lowest bid. *Cf. Bellefonte Borough Auth. v. Gateway Equip. & Supply Co.*, 442 Pa. 492, 277 A.2d 347 (1971) (where informational documents given to prospective bidders stated that bidder failing to execute construction contract would forfeit amount of bid bond as liquidated damages, bid bond constituted liquidated damages rather than penalty). Although the document does prohibit the withdrawal of bids within sixty days of the opening of the bids,[10] it also authorizes the City to waive minor defects in bids or to reject any and all bids. It does not indicate that the bond must be forfeited as liquidated damages if any of its terms are not followed.

It appears from the terms of the bid bond and from the provisions of the accompanying documents that the purpose of the bid bond is to compel the execution of a construction contract by the threat of exacting a payment in the amount of the bond as a punishment for failure to execute such a contract. *See* 2 G. Palmer, *The Law of Restitution* § 12.20, at 689 (1978) ("the purpose of the contract formed by the bid

> including ADDENDA. After BIDS have been submitted, the BIDDER shall not assert that there was a misunderstanding concerning the quantities of WORK or of the nature of the WORK to be done.
>
> ....
>
> The CONTRACT DOCUMENTS contain the provisions required for the construction of the PROJECT. Information obtained from an officer, agent, or employee of the OWNER or any other person shall not affect the risks or obligations assumed by the CONTRACTOR or relieve him from fulfilling any of the conditions of the contract.
>
> Each BID must be accompanied by a BID bond payable to the OWNER for five percent of the total amount of the BID. As soon as the BID prices have been compared, the OWNER will return the BONDS of all except the three lowest responsible BIDDERS. When the Agreement is executed the bonds of the two remaining unsuccessful BIDDERS will be returned. The BID BOND of the successful BIDDER will be retained until the payment BOND and the performance BOND have been executed and approved, after which it will be returned. A certified check may be used in lieu of BID BOND.
>
> A performance BOND and a payment BOND, each in the amount of 100 percent of the CONTRACT PRICE, with a corporate surety approved by the OWNER, will be required for the faithful performance of the contract.
>
> ....
>
> The party to whom the contract is awarded will be required to execute the Agreement and obtain the performance BOND and payment BOND within ten (10) calendar days from the date when NOTICE OF AWARD is delivered to the BIDDER. The NOTICE OF AWARD shall be accompanied by the necessary Agreement and BOND forms. In case of failure of the BIDDER to execute the Agreement, the OWNER may at his option consider the BIDDER in default, in which case the BID BOND accompanying the proposal shall become the property of the OWNER.
>
> ....
>
> The OWNER may make such investigations as he deems necessary to determine the ability of the BIDDER to perform the WORK, and the BIDDER shall furnish to the OWNER all such information and data for this purpose as the OWNER may request. The OWNER reserves the right to reject any BID if the evidence submitted by, or investigation of, such BIDDER fails to satisfy the OWNER that such BIDDER is properly qualified to carry out the obligations of the Agreement and to complete the WORK contemplated therein.
>
> ....
>
> Award will be made to the lowest responsible BIDDER.
>
> All applicable laws, ordinances, and the rules and regulations of all authorities having jurisdiction over construction of the PROJECT shall apply to the contract throughout.
>
> Each BIDDER is responsible for inspecting the site and for reading and being thoroughly familiar with the CONTRACT DOCUMENTS. The failure or omission of any BIDDER to do any of the foregoing shall in no way relieve any BIDDER from any obligation in respect to his BID....

10. Although the informational document given to bidders stated that bids could not be withdrawn within 60 days of opening, such a provision does not, of course, preclude withdrawal for a legally justifiable reason. *E.g. Connecticut v. F.H. McGraw & Co.*, 41 F.Supp. 369 (D.Conn. 1941) (applying Connecticut law; concluding that the effect of a provision in bid documents that bid could not be withdrawn within a certain number of days of bid opening was designed to assure that bidder would be relieved of its obligation only where legally justifiable); *Boise Junior College Dist. v. Mattefs Constr. Co.*, 92 Idaho 757, 450 P.2d 604 (1969) (same result).

bond ... is to give some assurance that the bidder will enter into a performance contract if his bid is accepted").

In ascertaining the purposes to be accomplished by a contract, one may also consider the circumstances surrounding the making of the contract. *I.M.A., Inc. v. Rocky Mtn. Airways, Inc.,* 713 P.2d 882 (Colo.1986); *Lorenzen v. Mustard's Last Stand, Inc.,* 196 Colo. 265, 586 P.2d 12 (1978). At trial, the City presented no evidence respecting the circumstances surrounding the execution of the bid bond and accompanying documents which would indicate that a purpose of the bid bond was to establish a liquidated damages sum.[11] Construing the bond documents together, as we must, it is clear that the parties intended the bid bond to constitute a penal sum. In the absence of any evidence in the record demonstrating that the purpose of the bond was to liquidate damages, we conclude that the parties did not mutually intend to liquidate damages, *see Rohauer v. Little,* 736 P.2d at 403; *O'Hara Group Denver, Ltd. v. Marcor Hous. Sys., Inc.,* 197 Colo. at 530, 595 P.2d at 679; *Perino v. Jarvis,* 135 Colo. at 393, 312 P.2d at 108. Rather, the bid bond as agreed upon by the parties here must be deemed a penal bond.[12]

### IV

The City also argues that under the terms of section 31–15–712, 12B C.R.S.

---

11. The trial court sustained Powder Horn's objection to the admissibility of testimony of Charles Decker, a Farmers Home Administration civil engineer, as to the purpose of a bid bond. Although not admitted into evidence, the City presented as an offer of proof the testimony of Decker to the effect that his understanding was that the primary purpose of a bid bond is to preserve the bidding process by guaranteeing that a construction contract will be entered into based upon the low bid. Although we need not decide the question of admissibility of Decker's testimony, we note that this testimony did not support the City's argument that the purpose of a bid bond is essentially to provide for liquidated damages.

12. Under common law a party's recovery on a penal bond is limited to actual damages shown. *E.g., Turck v. Marshall Silver Mining Co.,* 8 Colo. 113, 5 P. 838 (1884); A. Stearns, *The Law of Suretyship* § 8.17 (5th ed. 1951); 5 S. Williston,

(1986), it was compelled to award the construction contract to Powder Horn. We are not persuaded by the City's argument.

Section 31–15–712, 12B C.R.S. (1986), provides in pertinent part as follows:

**Public improvements by contract—cities.** All work done by the city in the construction of works of public improvement of five thousand dollars or more shall be done by contract to the lowest responsible bidder on open bids after ample advertisement.... If no bids are received or if, in the opinion of the city council, all bids received are too high, the city may enter into negotiations concerning the contract. No negotiated price shall exceed the lowest responsible bid previously received....

In *City of Colorado Springs v. Coray,* 25 Colo.App. 460, 139 P. 1031 (1914), the Court of Appeals concluded that under the predecessor to section 31–15–712 a municipality could be held liable for a public improvement contract only if the contract was an express contract and was approved by a majority of the city council or board of trustees. The plaintiff in that case alleged that he had superintended a public construction project, but failed to allege in his complaint that he had an express contract with the public authority. The City asserts that in light of the *Coray* decision section 31–15–712 must be read to require a munic-

---

*Law of Contracts* §§ 774–775A (3d ed. 1961). In contrast, where a penal bond is executed pursuant to a statutory requirement, the obligee may recover the full amount of the bond upon nonperformance regardless of whether actual damages are shown. *E.g., Clark v. Barnard,* 108 U.S. 436, 2 S.Ct. 878, 27 L.Ed. 780 (1883); *General Ins. Co. of Am. v. City of Colorado Springs,* 638 P.2d 752, 757 (Colo.1981); 5 S. Williston, *The Law of Contracts* § 775B (3d ed. 1961). However, where an indemnity bond is executed pursuant to a statutory requirement, upon nonperformance the obligee may recover only the amount of actual damages, not to exceed the face amount of the bond. *E.g., United States v. Zerbey,* 271 U.S. 332, 46 S.Ct. 532, 70 L.Ed. 973 (1926); *General Ins. Co. of Am. v. City of Colorado Springs,* 638 P.2d at 757. It is undisputed that no statute or ordinance, promulgated by either the General Assembly or the City, required the execution or forfeiture of the bid bond here.

ipality to award the construction contract to the lowest bidder even where that bidder inadvertently makes a substantial computational error. We cannot agree that the *Coray* decision necessarily compels such a conclusion. In *Coray* the Court of Appeals did not have before it the question of whether a municipality which properly put a project up for bids could forego awarding the contract to a bidder on the common law basis of mistake. *See City & County of Denver v. Bowen*, 67 Colo. 315, 317, 184 P. 357, 358 (1919). Moreover, the General Assembly has specifically provided that in the construction of statutes the common law shall remain in full force until repealed by legislative authority, § 2–4–211, 1B C.R.S. (1980), and section 31–15–712 does not by its terms purport to repeal the common law respecting mistakes in the formation of contracts.

However, assuming that the City is correct in concluding that the General Assembly initially intended to disallow any withdrawals of bids for public construction projects, that legislative intent was altered prior to the time of bidding in this case. In 1981, the General Assembly enacted the Procurement Code (the Code), §§ 24–101–101 to 24–112–101, 10 C.R.S. (1982). The Code is based upon the American Bar Association's Model Procurement Code for State and Local Governments, published in 1979. Section 24–103–202 of the Code, detailing the requirements to be met in competitive sealed bidding, provides in pertinent part as follows:

> (6) Withdrawal of inadvertently erroneous bids before the award may be permitted pursuant to rules if the bidder submits proof of evidentiary value which clearly and convincingly demonstrates that an error was made. Except as otherwise provided by rules, all decisions to permit the withdrawal of bids based on such bid mistakes shall be supported by a written determination made by the state purchasing director or the head of a purchasing agency.

§ 24–103–202(6), 10 C.R.S. (1982). Moreover, section 24–105–201 of the Code, a provision specifically dealing with bid bonds, provides in pertinent part as follows:

> **Bid security.** (1) Bid security shall be required for all competitive sealed bidding for construction contracts when the price is estimated by the procurement officer to exceed fifty thousand dollars.... Nothing in this subsection (1) prevents the requirement of such bonds on construction contracts under fifty thousand dollars.
>
> (2) Bid security shall be in an amount equal to at least five percent of the amount of the bid.
>
> ....
>
> (4) After the bids are opened, they shall be irrevocable for the period specified in the invitation for bids, except as provided in section 24–103–202(6). If a bidder is permitted to withdraw his bid before award, no action shall be had against the bidder or the bid security.

§ 24–105–201, 10 C.R.S. (1982). These provisions of the Code demonstrate a clear legislative intent to allow bidders who have inadvertently erred in the preparation of their bids to withdraw those bids before award of the contract without loss of bid bond. Although application of the Code provisions is mandatory only with respect to bodies of the state executive branch, section 24–101–105(2) of the Code specifically grants municipal authorities the power to apply any or all provisions of the Code. We conclude, therefore, that the City's contention that it was compelled by statutory law to award the contract to the lowest bidder even where that bid contained an inadvertent error is without merit.

### V

The judgment of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals with directions to reverse the judgment of the trial court and to remand the case to the trial court for determination of whether Powder Horn's bid was made in good faith. In the event the trial court determines the mistake was made in good faith, judgment should be entered for Powder Horn and against the City. In the event the trial court deter-

mines the mistake was not made in good faith, judgment should be entered for the City and against Powder Horn on the basis of the bond.

ERICKSON, J., dissents.

VOLLACK, J., dissents; MULLARKEY, J., joins in the dissent.

ERICKSON, Justice, dissenting:

I respectfully dissent. In my view, once a bid to a public authority is opened, the bid or offer becomes irrevocable, *see* 10 E. McQuillin, *The Law of Municipal Corporations* § 29.67, at 383 (3d ed. 1981),[1] and a unilateral mistake of a contractor does not justify rescission absent a showing that (1) the mistake relates to a material feature of the contract; (2) it occurred despite the exercise of reasonable care; and (3) the public authority can be placed in status quo.

*City of Florence v. Powder Horn Constructors, Inc.*, 716 P.2d 143, 144 (Colo. App.1985) (relying upon *John J. Calnan Co. v. Talsma Builders, Inc.*, 67 Ill.2d 213, 10 Ill.Dec. 242, 367 N.E.2d 695 (1977)). The irrevocability of the bid is, to an extent, supported by the "Information for Bidders" section of the bid contract which provides that: "No BIDDER may withdraw a BID within 60 days of the actual date of the opening thereof."

While I acknowledge that the *John J. Calnan Co.* case is distinguishable on its facts from this case, I believe that it provides the best formula for balancing the need to preserve the trial court's ability to grant the equitable remedy of rescission in meritorious cases, against the need to preserve the integrity of the bidding process and to diminish the frequency of fraud, collusion, and careless bid preparation.

The majority questions whether any legitimate purpose is served by requiring a bidder to establish freedom from negligence, asserting that "such requirement would in these limited circumstances se-

verely undermine policies of fostering fair dealing and certainty among contracting parties essential to any contract negotiation process." Maj. op. at 361. The majority asserts that requiring a lack of negligence "focuses substantial evidence on the cause of the mistake," when primary focus should be given to the "consequences of the mistake." Maj. op. at 362. Accordingly, the majority concludes that in order to rescind the bid Powder Horn must establish a "good faith mistake." Maj. op. at 365.

In my view, simply requiring a contractor to submit a bid in good faith compromises the integrity of the bidding process by failing to penalize sloppy bid preparation and by failing to discourage fraud by contractors who seek to rescind a bid that is not the product of clerical error but rather a mistake in judgment on the contractor's part. A majority of jurisdictions has adopted the requirement that a contractor demonstrate that he exercised reasonable care before he is allowed to rescind a bid. *See* 10 E. McQuillin, *The Law of Municipal Corporations* § 29.67, at 383 (3d ed. 1981); Annotation, *Right of Bidder for State or Municipal Contract to Rescind Bid on Ground That Bid Was Based Upon His Own Mistake or That of His Employee*, 2 A.L.R.4th 991, 1003-13 (1980).

In this case, it is conceded that Powder Horn's $73,326 error was material, thus satisfying the first element of the three-part test set forth by the court of appeals. With respect to the negligence element, the trial court concluded that Powder Horn failed to exercise reasonable care in preparing its bid. Because this finding is supported by the record, *see* maj. op. at 358-359 (Vollack, J., dissenting), we will not disturb it. We need not address the third element because Powder Horn failed to exercise reasonable care in preparing its bid.

While I believe that under the bid bond the City is limited to actual damages not to

---

1. Section 24–105–201(4), 10 C.R.S. (1982), provides in pertinent part: "After the bids are opened, they shall be irrevocable for the period specified in the invitation for bids, except as provided in section 24–103–202(6)." I note,

however, that the language in section 24–103–202(6), 10 C.R.S. (1982), relating to withdrawal of inadvertently erroneous bids is permissive, not mandatory. *See* Maj. op. at 359 (Vollack, J., dissenting).

exceed the limits of the bond, I am not convinced that the court of appeals or the trial court considered the actual damages suffered by the City. *See City of Florence,* 716 P.2d at 145. Accordingly, I would return the case to the court of appeals for remand to the district court to determine actual damages suffered by the City.

VOLLACK, Justice, dissenting:

I respectfully dissent. While I agree with the majority that considerations of equity require the rejection of the "firm bid" rule, I do not agree with the majority's conclusion that a low bidder can demand rescission of a public construction contract as a result of a mistaken bid merely by showing that he acted in good faith. I believe that under such circumstances a low bidder cannot escape liability for the consequences of his mistake simply by showing that he acted in good faith, but must prove that his mistake occurred despite the exercise of reasonable care. The rule adopted by the majority fails to give due weight to the public character of the bidding process. Such a rule serves to undermine confidence in the public construction bidding process and ignores the intent of the General Assembly in enacting its version of the Model Procurement Code.

## I.

The majority concludes that

in the absence of controlling legislation, a bidder for a public construction contract who submits a bid containing a mistake may rescind the bid prior to its acceptance if the bidder establishes by a preponderance of the evidence that the mistake is of a clerical or mathematical nature; that the mistake was made *in good faith* and relates to a material as-

pect of the bid; and that the public authority did not rely to its detriment on the mistaken bid.

Maj. op. at 363–364 (emphasis added). The majority nowhere defines good faith. I believe some definitional guidance is required. Black's Law Dictionary defines good faith as:

[A]n intangible and abstract quality with no technical meaning or statutory definition, and it encompasses, among other things, an honest belief, the absence of malice and the absence of design to defraud or to seek an unconscionable advantage, and an individual's personal good faith is concept of his own mind and inner spirit and, therefore, may not conclusively be determined by his protestations alone. Honesty of intention, and freedom from knowledge of circumstances which ought to put the holder upon inquiry. An honest intention to abstain from taking any unconscientious advantage of another, even through technicalities of law, together with absence of all information, notice, or benefit or belief of facts which render transaction unconscientious. In common usage this term is ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's duty or obligation.

*Commercial Law.* Honesty in fact in the conduct or transaction concerned. U.C.C. § 1–201(19). In the case of a merchant, honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade. U.C.C. § 2–103(1)(b).

Black's Law Dictionary 623–24 (5th ed. 1979) (citations omitted).

The common element to the definition of good faith[1] is honesty, which requires an

---

**1.** Good faith is also defined in the Uniform Commercial Code (UCC). Article Two of the UCC applies expressly to contracts for transactions in goods and by analogy to service contracts which include transactions in goods. *See* UCC § 2–102 (1978); 1 R. Anderson, *Anderson on the Uniform Commercial Code* 502 (3d ed. 1981). In *Colorado Carpet Installation, Inc. v. Palermo,* 668 P.2d 1384 (Colo.1983), this court recognized a "primary purpose" test to deter-

mine whether the UCC applied to a service contract which included a sale of goods. Four useful factors were identified to determine whether "goods" or "services" predominates. They include:

(1) the contractual language used by the parties;

(2) whether the agreement involves one overall price that includes both goods and labor

evaluation of the subjective intention of the parties. In order to demand rescission of a negligently prepared bid under the majority's rule, the low bidder need only prove an absence of bad faith, which is to say, that the bid was submitted without an intent to defraud. To refute such a claim, the City would have to show that the low bidder acted in bad faith through dishonesty. Such a standard would allow a bidder to escape responsibility for conduct that might well have been prevented by exercising reasonable care and would impose an impossible evidentiary burden on the City to circumvent.

> [T]he standard of good faith for merchants is one which can be asserted in a variety of circumstances, and is often used as a sword in avoiding liability.... It is a standard that is difficult to deal with and hard to define in any given situation, and is used creatively in a variety of contexts to challenge rights and liabilities under sales contracts.

> or, instead, calls for separate and discrete billings for goods on the one hand and labor on the other;
> (3) the ratio that the cost of goods bears to the overall contract price; and
> (4) the nature and reasonableness of the purchaser's contractual expectations of acquiring a property interest in goods....

*Id.* at 1388–89 (citations omitted). Determination of these factors cannot be made in this case because the facts were not presented to the trial court. In any event, the purpose of applying the UCC to the facts of this case is not to create a precedent requiring all contractors of services to assume the duties of the UCC, but to make use of a standard analysis in the absence of definitional guidelines by the majority.

Assuming for the sake of this analysis that the UCC applies to these facts, the UCC creates two standards of good faith depending on whether the party is a merchant. Section 2–103(1)(b) defines good faith for merchants as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Section 1–201(19) defines good faith for nonmerchants as "honesty in fact in the conduct or transaction concerned."

Section 2–104(1) defines the term "merchant" as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction...." This definition obviously includes contractors such as Powder Horn. Consequently, Powder Horn's conduct must be measured

3 R. Duesenberg & L. King, *Sales & Bulk Transfers Under The Uniform Commercial Code* § 4.08[3][a] [ii], at 4–267 to –269 (1987) (footnotes omitted).

## II.

Requiring a contractor to show that his error occurred despite the exercise of reasonable care as a condition precedent to rescission of a public construction contract is a sensible alternative to a good faith rule. In fact, it appears to be the rule in a majority of jurisdictions. *See* 10 E. McQuillin, *The Law of Municipal Corporations* § 29.67, at 383 (3d ed. 1981); 3 J. Pomeroy, *A Treatise on Equity Jurisprudence* § 870a, at 388 (5th ed. 1941); Annotation, *Right of Bidder for State or Municipal Contract to Rescind Bid on Ground that Bid Was Based Upon His Own Mistake or That of His Employee,* 2 A.L.R.4th 991, 1003–13 (1980).

Prohibiting a contractor from rescinding a negligently prepared bid furthers a number of public policies.

under the good faith standard of section 2–103(1)(b) rather than the good faith standard of section 1–201(19).

"Honesty in fact" is measured subjectively, while "the observance of reasonable commercial standards of fair dealing in the trade" is measured objectively. J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 6–3, at 218 (2d ed. 1980). The observance of reasonable commercial standards of fair dealing in the trade is a lower standard than the standard of reasonable care. *See* 1956 Recommendation of the Editorial Board for the Uniform Commercial Code 21; Burton, *Good Faith Performance of a Contract Within Article 2 of the Uniform Commercial Code,* 67 Iowa L.Rev. 1 (1981); Farnsworth, *Good Faith Performance and Commercial Reasonableness Under the Uniform Commercial Code,* 30 U.Chi.L. Rev. 666, 675 (1963).

Where merchants are concerned, bad faith can also be shown through failure to observe reasonable standards of fair dealing in the trade. Although this can sometimes be proved through evidence of gross negligence, commentators agree that the standard created by "observance of reasonable commercial standards of fair dealing in the trade" is ambiguous at best and incoherent at worst. *See* Burton, *Good Faith Performance of a Contract Within Article 2 of the Uniform Commercial Code,* 67 Iowa L.Rev. 1, 21–23, 25–29 (1981); Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code,* 54 Va.L.Rev. 195 (1968).

It is of paramount importance that the integrity of the bidding process not be compromised by those entrusted with providing the state's citizens the improvements that public policy and the law command. In interpreting the requirements of the bidding process the court must keep in mind that the procedures "are designed to prevent fraud, collusion, favoritism and improvidence in the administration of public business as well as to insure that the public receives the best work or supplies at the most reasonable price practicable."

*Dillingham Constr., Inc. v. Milwaukee Metro. Sewerage Dist.*, 629 F.Supp. 406, 409 (E.D.Wis.1986) (quoting *Nelson, Inc. v. Sewerage Comm'n*, 72 Wis.2d 400, 409, 241 N.W.2d 390, 395 (1976)).

The majority recognizes that Powder Horn's bid was negligently prepared. It nevertheless minimizes the role that reasonable care plays in the public bidding process by stating that "[t]he very term 'mistake' usually connotes some degree of negligent conduct." Maj. op. at 361.

Contrary to the majority's intimation, reasonable care has never been equated with absolute blamelessness. Rather, the question of whether a mistake constitutes negligence depends on the circumstances and requires an objective comparison of particular conduct to what a reasonably prudent person would do in the same situation in light of the recognized risk associated with it. *See* W. Keeton, *Prosser and Keeton on the Law of Torts* § 31, at 170–73 (5th ed. 1984); Restatement (Second) of Torts §§ 282, 283 (1965). In the area of mistaken bids, I believe the most useful standard for determining whether a mistake constitutes negligence is the standard practice or custom in the construction industry.[2] It is undisputed that failure to observe industry standards of reasonable care is evidence of negligence. *See* W. Keeton, *Prosser and Keeton on the Law of*

*Torts* § 33, at 195 (5th ed. 1984). Powder Horn's conduct falls short of those standards.

Cletus Donahue, Powder Horn's president and bidder on the Florence project, testified that he could have picked up the specifications for the Florence project from the City on December 24, 1981, but chose to wait until January 6, 1982, to do so. This reduced from twenty-seven to fourteen the number of days Powder Horn had to prepare its bid.

The Florence project estimator, Michael O'Clair, calculated the cost of concrete and labor associated with wall forming for the Florence project on page fifteen of his bid book. The bid book was a three ring binder that permitted removal of all of its pages. O'Clair testified that the estimates on page fifteen were completed on January 18, more than twenty-four hours before the erroneous bid was submitted. The missing page had been removed from the bid book on January 19, even though no changes were subsequently made to it.

O'Clair admitted that he failed to fill in three of the preprinted blank spaces on the missing page fifteen. These blanks included space for the estimator to fill in his initials, to recheck his original estimate, and to total the costs on the page. Neither he nor Donahue, Powder Horn's other estimator, had double-checked his page fifteen estimate of the cost of labor and concrete for the Florence project.

Following a bench trial, the trial judge found that waiting two weeks to pick up the specifications, removing pages from the bid book that did not need last-minute revision, and failing to use the series of checks built into its system, made Powder Horn's mistaken bid a product of negligence. In fact the trial judge suggested that Powder Horn's bidding procedure may have constituted gross negligence.[3]

---

2. This is not to say that compliance with industry standards can never constitute negligence. *See The T.J. Hooper*, 60 F.2d 737, 740 (2d Cir.), *cert. denied sub nom. Eastern Transp. Co. v. Northern Barge Corp.*, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932). That issue, however, is not before the court.

3. In his order, the trial judge noted that
    the two relatively large items in Number 4, as to Item 4 on Page 15 of Exhibit 1, that were omitted ... and I wonder about ... *it seems to me that that's just more than ordinary neglect ... that it amounts to something else*

Errors in calculating a bid can occur despite the exercise of reasonable care on the part of the contractor. When such errors occur despite the exercise of reasonable care, I believe that rescission is an appropriate remedy to consider as long as the mistake also relates to a material feature of the contract and rescission could return the City to the position it was in before accepting Powder Horn's bid. *See, e.g., John J. Calnan Co. v. Talsma Builders, Inc.,* 67 Ill.2d 213, 10 Ill.Dec. 242, 367 N.E. 2d 695 (1977). That this error was due to Powder Horn's negligence increases my belief that rescission of the contract is not the appropriate remedy in this case.

### III.

The majority correctly concludes that section 24–103–202(6) does not prohibit the City from permitting Powder Horn to rescind the contract. This analysis nevertheless overlooks the more important question of whether in such circumstances the City is *required* to permit the contractor to rescind the contract. The clear language of section 24–103–202(6) shows that the General Assembly never intended to prohibit municipalities such as the City [4] from enforcing a contract based on a mistaken bid.

Section 24–103–202(6) states that "[w]ithdrawal of inadvertently erroneous bids before the award *may* be permitted pursuant to rules if the bidder submits proof of evidentiary value which clearly and convincingly demonstrates that an error was made." 10 C.R.S. (1982) (emphasis added). Significantly, the General Assembly declined to adopt the Model Procurement Code's bid withdrawal rule, which would have required public authorities to permit a contractor to withdraw an inadvertently erroneous bid.[5] The majority's rule would require withdrawal of all erroneous bids made in good faith, which is essentially the same standard that was proposed by the Model Procurement Code and rejected by the General Assembly.[6]

and this was the concrete and the labor. These were considerable amounts ... which I think a reasonable contractor should not have missed. Nor, in the Court's opinion, would a reasonable contractor not, on a bid of this magnitude, almost $700,000, go through and add up figures one more time.

(Emphasis added). He concluded that

I think you have a combination here, I think, using the papers as spread in the courtroom, the system demonstrated by defense probably in and of itself was, I mean, that was ludicrous to the Court. How you could avoid an error ... if I did my income taxes that way I would be in Leavenworth now. It just won't work that way.

4. Section 24–101–105(2) states that "[a]ll political subdivisions and local public agencies of this state are authorized to adopt all or any part of this code and its accompanying rules." The City has not adopted the Procurement Code. Nevertheless, it is fair to assume that other municipalities have adopted the Procurement Code, thereby making relevant the intent of the General Assembly as it applies to policy considerations implicated by the majority's rule.

5. Section 3–202(6) of the Model Procurement Code states:

**Correction or Withdrawal of Bids; Cancellation of Awards.** Correction or withdrawal of inadvertently erroneous bids before or after award, or cancellation of awards or contracts based on such bid mistakes, *shall* be permitted in accordance with regulations promulgated by the Policy Office. After bid opening no changes in bid prices or other provisions of bids prejudicial to the interest of the [State] or fair competition shall be permitted. Except as otherwise provided by regulation, all decisions to permit the correction or withdrawal of bids, or to cancel awards or contracts based on bid mistakes, shall be supported by a written determination made by the Chief Procurement Officer or head of a Purchasing Agency.

(Emphasis added).

6. The word "inadvertent," which appears in section 3–202 of the Model Procurement Code and section 24–103–202(6) of the Colorado Revised Statutes as "inadvertently," is defined as "heedless, negligent, inattentive ... unintentional." *Webster's Third New International Dictionary* 1140 (1986). *Black's Law Dictionary* 683 (5th ed. 1979) defines "inadvertence" as "[h]eedlessness; lack of attention; want of care; carelessness; failure of a person to pay careful and prudent attention to the progress of a negotiation or a proceeding in court by which his rights may be affected." Neither the text nor the commentary to section 3–202(6) resolves the ambiguity created by the word "inadvertently" as to whether the Model Procurement Code intends to adopt a good faith standard or a negligence standard for permitting rescission of an erroneous bid. Section 24–103–202(6) is similarly silent. This ambiguity underscores but one problem of the Model Procurement Code's effort to codify bid mistake rules. *See* Rudland, *Ration-*

Requiring Powder Horn to show that its error occurred despite the exercise of reasonable care is faithful to the policy considerations that underlie the Colorado Procurement Code. Section 24–101–102 recites the underlying purposes and policies of Colorado's version of the Model Procurement Code. These purposes and policies are:

(a) To simplify, clarify, and modernize the law governing procurement by the state of Colorado;

(b) To provide for increased public confidence in the procedures followed in public procurement;

(c) To ensure the fair and equitable treatment of all persons who deal with the procurement system of the state of Colorado;

(d) To provide increased economy in state procurement activities and to maximize to the fullest extent practicable the purchasing value of public funds of the state of Colorado;

(e) To foster effective broad-based competition within the free enterprise system; and

(f) To provide safeguards for the maintenance of a procurement system of quality and integrity.

10 C.R.S. (1982).

Permitting bid withdrawal for mistakes that occur despite the exercise of reasonable care ensures fair treatment of low bidders by relieving them of burdens caused by mistakes they could not reasonably have prevented. Requiring bidders to conform bids to the industry standards of reasonable care maintains the integrity of the bidding process, and in turn increases public confidence in the procedures followed in public procurement.

A good faith rule that permits rescission of contracts for careless errors in bids, by contrast, would undermine the policy considerations outlined in the Procurement Code. Careless bids diminish the purchasing value of public funds in violation of section 24–101–102(2)(d). A low bidder has an economic incentive to bring to the attention of the public authority any error whose actual cost for a given item exceeds its estimated cost, resulting in a net loss to the bidder for that item. Yet a low bidder has no corresponding incentive to bring to the attention of the public authority an error resulting in a net gain to the bidder because he has already been awarded the contract. Accordingly, the purchasing value of public funds can be diminished but not increased by permitting rescission of carelessly computed bids.

Careless bids also lower public confidence in the procedures followed in public procurement in violation of section 24–101–102(2)(b). A low bidder would receive the opportunity, denied to all other bidders, to reconsider his bid in light of competitors' bids which are known to be higher than his and which are required to remain available for public inspection by custom and, in those municipalities that have adopted the Procurement Code, by statute. *See, e.g.,* § 24–103–202(4), 10 C.R.S. (1982). Rescission could then become simply another business option in the event that an opportunity to make a larger profit arises after the bids are open. Even the possibility of such an option would erode public confidence in the public procurement process. That the public authority could not prevent rescission by showing that the mistake was due to the bidder's negligence would further undermine that public confidence.

Finally, permitting contractors to rescind carelessly prepared bids would confuse rather than simplify public procurement in violation of section 24–101–102(2)(a) by introducing greater uncertainty into the bid process. Public authorities could no longer consider the bid process complete when the bids were opened. Bids could no longer be considered irrevocable for the time period specified in the invitation for bids as required by contract between the parties, by custom in the industry, and by statute in those municipalities that have adopted the Procurement Code. *See, e.g.,* § 24–105–201(4), 10 C.R.S. (1982). The good faith rule adopted by the majority could conceivably cause public authorities to accelerate the formal acceptance process

to the time of bid opening so as to remove the uncertainty that the good faith rule creates.

## IV.

Finally, the majority's rule gives insufficient consideration to the public character of the bidding process. Unlike bids in the private sector, bids in the public sector must be awarded to the lowest responsible bidder. § 31–15–712, 12B C.R.S. (1986).[7] Although the City has not adopted the Procurement Code, its contract with Powder Horn contains the same elements. The informational document provided to all bidders and incorporated by reference into the bid contract requires each applicant to submit a sealed bid which may not be revoked for sixty days after opening. Each bid must be accompanied by a bid bond for five percent of the total amount of the bid. Bids must be opened publicly and read aloud in accordance with the advertisement for bids. As the Procurement Code recognizes, these elements are designed to maintain the integrity of the bidding process. In addition, the informational document incorporated into the bid contract states that

> [t]he party to whom the contract is awarded will be required to execute the Agreement and obtain the performance BOND and payment BOND within ten (10) calendar days from the date when NOTICE OF AWARD is delivered to the BIDDER. The NOTICE OF AWARD shall be accompanied by the necessary Agreement and BOND forms. In case of failure of the BIDDER to execute the Agreement, the OWNER *may at his option* consider the BIDDER in default, in which case the BID BOND accompanying the proposal shall become the property of the OWNER.

(Emphasis added).

The majority's analysis defeats the express provisions of the bid contract by permitting rescission not at the City's option but merely upon a showing that the con-

tractor's error was not a product of bad faith. More importantly, its analysis places no weight on the significance of requiring bid bonds. Private parties are not required to accept the lowest bid, and do not generally require bid bonds. But these procedures, so vital to the public bid process, are designed to avoid the appearance that any form of favoritism is practiced in public procurement by awarding the contract in all cases to the lowest responsible bidder. In this way the parties satisfy their duties not simply to themselves but to the public which demands that expenditures of public funds be above reproach.

Every contract obligates the parties to act in good faith. *Restatement (Second) of Contracts* § 205 (1979). By requiring no more of bidders than good faith in rescinding contracts, the majority relieves contractors of the higher obligations attending management of public funds. The rule calls into question the very existence of bid bonds because the evidentiary burden on the contractor is so minimal.

I would adopt the three-part test of *John J. Calnan Co. v. Talsma Builders, Inc.,* 67 Ill.2d 213, 10 Ill.Dec. 242, 367 N.E.2d 695 (1977), and require a contractor to show as a condition precedent to rescission that (1) the mistake relates to a material feature of the contract; (2) the mistake occurred despite the exercise of reasonable care; and (3) rescission could return the public authority to the status quo. I believe that the proper measure of damages when a bidder fails to prove that he is entitled to rescission is the difference between the two lowest bids, not to exceed the amount of the bid bond.

I would affirm the court of appeals.

I am authorized to say that Justice MULLARKEY joins me in this dissent.

---

7. Section 31–15–712 states in pertinent part:
   All work done by the city in the construction of works of public improvement of five thousand dollars or more *shall* be done by con-

tract to the lowest responsible bidder on open bids after ample advertisement. . . .
12B C.R.S. (1986) (emphasis added).